**Klaus ZOELSCH, Appellant,**

v.

**ARTHUR ANDERSEN & CO.**

No. 86–5351.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 19, 1987.

Decided July 17, 1987.

---

David N. Yellen, with whom James K. Stewart, Washington, D.C., was on the brief for appellant.

Milton Eisenberg, with whom Lydia H. Suffling, Washington, D.C., was on the brief for appellee.

Before WALD, Chief Judge, and BORK and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge BORK.

Opinion concurring in the judgment filed by Chief Judge WALD.

BORK, Circuit Judge:

Klaus Zoelsch brought this action against Arthur Andersen & Co. in federal court in the District of Columbia on behalf of himself and at least thirty-one others, all citizens of the Federal Republic of Germany. In the complaint, he stated two claims under the United States securities laws and four common law claims. He alleged federal court jurisdiction on the basis of the federal claims and diversity of citizenship. The district court dismissed the action for want of subject matter jurisdiction. Zoelsch appeals only the district court's refusal of jurisdiction over the federal claims. We affirm.

## I.

The transactions that led to this lawsuit involved four principal participants. Dr. Loescher und Co. KG ("Loescher") is a West German limited partnership. First American International Real Estate Limited Partnership ("FAIR") is an American limited partnership based in Miami, Florida. Arthur Andersen & Co. GmbH ("GmbH") is a West German limited liability corporation. Arthur Andersen & Co. ("AA–USA"), the sole defendant in this case, is an American general partnership organized under the laws of Illinois.

Zoelsch and the other West Germans invested in an intricate investment and tax shelter plan. Under the plan, their funds were placed either directly with Loescher, or indirectly with another West German entity that is a limited partner of Loescher. In either case, the investors understood that their funds would be channeled through these entities to FAIR. FAIR, in turn, would invest the funds in property and condominium conversions in Memphis, Tennessee, and Atlanta, Georgia.

In April of 1981, Loescher and FAIR entered into an investment agreement. In September of 1981, Loescher commissioned GmbH to prepare an audit report on the entire plan, including an analysis of FAIR's written description of the American investments. Within the month, GmbH issued its report. Loescher then solicited investors by distributing a package of materials to them, which included GmbH's audit report and FAIR's materials. It is undisputed that FAIR's materials were prepared in the United States, that the audit report was prepared in West Germany, and that the package of materials was distributed only in West Germany to West German investors. The investments were not successful, and Zoelsch's complaint alleges that he and the other investors detrimentally relied on a number of false representations and material omissions in the audit report.[1]

1. Among the misrepresentations and omissions alleged by Zoelsch are the following: that his investment would be registered as a silent investment; that FAIR had a $2 million paid-in equity; that FAIR's capitalization was sufficient to assure successful implementation of the in-

Zoelsch has brought a separate suit against GmbH in Munich, West Germany. He brings this suit, however, only against AA–USA, which was not directly involved in the solicitation of these investors or in the preparation of any of the documents that induced these purchases of securities. The sole link between AA–USA and the package of materials distributed by Loescher is one reference to AA–USA in the audit report prepared by GmbH. The reference is in German, and plaintiff's translation reads: "With respect to a number of data and particulars in the prospectus in conjunction with the economic fundamentals we have made inquiries thereabout by way of our branch-establishment Arthur Andersen & Co., Memphis." Joint Appendix ("J.A.") at 70. Defendant's translation is somewhat different: "With respect to some general prospect data relating to the overall environment we have made inquiries through the office of Arthur Andersen & Co. Memphis." Brief for Appellee at 7 n. 2. We do not have the original German version but the difference between the two translations does not affect our jurisdictional determination.

Zoelsch's complaint alleged that AA–USA provided false and misleading information to GmbH with ample reason to know that this information would be incorporated in GmbH's audit report and would be relied on by investors such as Zoelsch. *See* Complaint ¶¶ 16–18, J.A. at 28–29. Zoelsch alleged fraud in connection with the sale of securities and the aiding and abetting of securities fraud in violation of section 10(b) of the Securities Exchange Act of 1934 and its attendant Rule 10b–5. *See* 15 U.S.C. § 78j(b) (1982); 17 C.F.R. § 240.10b–5 (1985). The district court granted defendant's motion to dismiss for lack of subject matter jurisdiction.

## II.

### A.

The issue, not previously addressed in this circuit, is American court jurisdiction over securities law claims against a defendant who acted in the United States when the securities transaction occurred abroad and there was no effect felt in this country.

Congress can, of course, prescribe the extent of federal jurisdiction over actions to enforce the federal securities laws, so long as it does not overstep the broad limits set by the due process clause. *See, e.g., Leasco Data Processing Equip. Corp. v. Maxwell,* 468 F.2d 1326, 1334 (2d Cir. 1972). But in the Securities Exchange Act of 1934, Congress said little that bears on this issue. The explicit purposes of the Act are:

> to remove impediments to and perfect the mechanisms of a national market system for securities and a national system for the clearance and settlement of securities transactions and the safeguarding of securities and funds related thereto, and to impose requirements necessary to make such regulation and control reasonably complete and effective, in order to protect interstate commerce, the national credit, the Federal taxing power, to protect and make more effective the national banking system and Federal Reserve System, and to insure the maintenance of fair and honest markets in such transactions.

15 U.S.C. § 78b (1982). The relevant language of section 10(b) prohibits "any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails" from using "in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance" proscribed by the SEC. *Id.* § 78j(b). "Interstate commerce" is broadly defined to include "trade, commerce, transportation, or communication ... between any foreign country and any State." *Id.* § 78c(a)(17). And the federal district courts are given exclusive jurisdiction of suits brought to enforce the securities laws. *See id.* § 78aa. These provisions frame a fairly broad grant of jurisdic-

vestment plan; that FAIR was the actual owner of certain apartments in Memphis; that FAIR had purchased a particular building for $8 mil-lion; and that the building purchased was leased and economically viable. *See* Complaint ¶¶ 27a–27h, Joint Appendix ("J.A.") at 22–29.

tion, but they furnish no specific indications of when American federal courts have jurisdiction over securities law claims arising from extraterritorial transactions.

A single passage in the statute addresses this issue explicitly. Section 30(b) states that the 1934 Act "shall not apply to any person insofar as he transacts a business in securities without the jurisdiction of the United States, unless he transacts such business in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate to prevent the evasion of this chapter." 15 U.S.C. § 78dd(b) (1982). But AA–USA is not alleged to have transacted a business in securities anywhere. Nevertheless, as will be seen, *infra* 31–32, section 30(b) gives some reinforcement to the conclusion that there is no jurisdiction to entertain Zoelsch's claims.

If the text of the 1934 Act is relatively barren, even more so is the legislative history. Fifty years ago, Congress did not consider how far American courts should have jurisdiction to decide cases involving predominantly foreign securities transactions with some link to the United States. The web of international connections in the securities market was then not nearly as extensive or complex as it has become. In this state of affairs, our inquiry becomes the dubious but apparently unavoidable task of discerning a purely hypothetical legislative intent. As Judge Friendly candidly put it in a very similar case:

> We freely acknowledge that if we were asked to point to language in the statutes, or even in the legislative history, that compelled these conclusions, we would be unable to respond. The Congress that passed these extraordinary pieces of legislation in the midst of the depression could hardly have been expected to foresee the development of offshore funds thirty years later.... Our conclusions rest on ... our best judgment as to what Congress would have wished if these problems had occurred to it.

*Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 993 (2d Cir.), *cert. denied*, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975).

**B.**

The courts have not confined federal jurisdiction to securities transactions consummated in the United States. They have deviated from this position in two respects. First, they have asserted jurisdiction over extraterritorial conduct that produces substantial effects within the United States, such as effects on domestic markets or domestic investors. *See, e.g., Schoenbaum v. Firstbrook*, 405 F.2d 200, 206–08 (2d Cir.), *partially rev'd on other grounds*, 405 F.2d 215 (1968), *cert. denied*, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969). Second, they have asserted jurisdiction in some cases over acts done in the United States that "directly caused" the losses suffered by investors outside this country. *See, e.g., Bersch*, 519 F.2d at 991–93.

Zoelsch concedes that jurisdiction in this case cannot be premised on domestic "effects" of predominantly foreign conduct, *see* Brief for Appellant at 5–6; *Zoelsch v. Arthur Andersen & Co.*, No. 85–2353, mem. op. at 4 (D.D.C. Apr. 29, 1986), and "[j]urisdiction may not be sustained on a theory that the plaintiff has not advanced." *Merrell Dow Pharmaceuticals Inc. v. Thompson*, —— U.S. ——, 106 S.Ct. 3229, 3233 n. 6, 92 L.Ed.2d 650 (1986). Zoelsch relies on AA–USA's domestic conduct as the basis for jurisdiction.

Several tests have been devised for determining when American courts have jurisdiction over domestic conduct that is alleged to have played some part in the perpetration of a securities fraud on investors outside this country. The Second Circuit has set the most restrictive standard. It has declined jurisdiction over alleged violations of the securities laws based on conduct in the United States when the conduct here was "merely preparatory" to the alleged fraud, that is, when the conduct here did not "directly cause" the losses elsewhere. *See, e.g., Bersch*, 519 F.2d at 992–93; *IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1018 (2d Cir.1975). In later cases, the line

between domestic conduct that is "merely preparatory" and conduct that "directly causes" the losses elsewhere has been significantly clarified. The Second Circuit's rule seems to be that jurisdiction will lie in American courts where the domestic conduct comprises all the elements of a defendant's conduct necessary to establish a violation of section 10(b) and Rule 10b–5: the fraudulent statements or misrepresentations must originate in the United States, must be made with scienter and in connection with the sale or purchase of securities, and must cause the harm to those who claim to be defrauded, even though the actual reliance and damages may occur elsewhere. *See IIT v. Cornfeld,* 619 F.2d 909, 920–21 (2d Cir.1980); *cf. Vencap,* 519 F.2d at 1018 (finding of jurisdiction "is limited to the perpetration of fraudulent acts themselves"); *Leasco,* 468 F.2d at 1335 ("if defendants' fraudulent acts [occurred] in the United States ... it would be immaterial ... that the damage resulted, not from the contract ... procured in this country, but from interrelated action which he induced in England").

The Third, Eighth, and Ninth Circuits appear to have relaxed the Second Circuit's test. They too have asserted jurisdiction only when the conduct in this country "directly causes" the losses elsewhere. *See SEC v. Kasser,* 548 F.2d 109, 115 (3d Cir.), *cert. denied,* 431 U.S. 938, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977); *Continental Grain (Australia) Pty. Ltd. v. Pacific Oilseeds, Inc.,* 592 F.2d 409, 418–20 (8th Cir.1979); *Grunenthal GmbH v. Hotz,* 712 F.2d 421, 424 (9th Cir.1983). But in *Continental Grain* the court explicitly repudiated the Second Circuit's requirement that "domestic conduct constitute the elements of a rule 10b–5 violation," 592 F.2d at 418, in favor of a test that would find jurisdiction whenever the domestic conduct "was in furtherance of a fraudulent scheme and was significant with respect to its accomplishment." *Id.* at 421. The Third Circuit's formulation seems more permissive, allowing subject matter jurisdiction "where at least some activity designed to further a fraudulent scheme occurs within this country." *Kasser,* 548 F.2d at 114. The conse-

quence of these approaches has been a loosening of the jurisdictional requirements: any significant activity undertaken in this country—or perhaps any activity at all—that furthers a fraudulent scheme can provide the basis of American jurisdiction over the domestic actor.

### C.

■ We believe that a more restrictive test, such as the Second Circuit's, provides the better approach to determining when American courts should assert jurisdiction in a case such as this. There is no doubt, of course, that Congress could confer jurisdiction over activity like that alleged to have been engaged in by AA–USA. Moreover, considerations of comity, which will often cause a court to stay its hand, appear to be minimal or nonexistent here. Appellants do not seek to have us assert jurisdiction over West German parties, nor would a judgment about AA–USA's conduct in the United States necessarily or even probably require a pronouncement on the propriety of the behavior of the West German parties. The case going forward in the Federal Republic would likely be unaffected by this case. Nevertheless, we think we should not assert jurisdiction.

We begin from the established canon of construction that "legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States," which "is based on the assumption that Congress is primarily concerned with domestic conditions." *Foley Bros. v. Filardo,* 336 U.S. 281, 285, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949); *see also Sandberg v. McDonald,* 248 U.S. 185, 195, 39 S.Ct. 84, 86, 63 L.Ed. 200 (1918); *Commodity Futures Trading Comm'n v. Nahas,* 738 F.2d 487, 493 (D.C.Cir.1984); *FTC v. Compagnie de Saint-Gobain-Pont-A-Mousson,* 636 F.2d 1300, 1322–23 (D.C. Cir.1980). And even aside from this presumption, it is quite clear that the Securities Exchange Act of 1934 had as its purpose the protection of American investors and markets. *See, e.g.,* H.R.Rep. No. 1383, 73d Cong., 2d Sess. 1–16 (1934); S.Rep. No. 792, 73d Cong., 2d Sess. 1–13 (1934). That

is the inference to be drawn from section 30(b) as well, for it states that the statute does not apply to persons transacting business in securities abroad unless the Securities and Exchange Commission issues rules and regulations making the statute applicable to such persons because that is "necessary or appropriate to prevent the evasion" of the statute. That rather clearly implies that Congress was concerned with extraterritorial transactions only if they were part of a plan to harm American investors or markets. The Commission has never issued such rules or regulations and there is no allegation in this case that AA–USA's conduct was engaged in to evade American law.

Courts have also been concerned to preserve American judicial resources for the adjudication of domestic disputes and the enforcement of domestic law. *Bersch,* 519 F.2d at 985 ("When, as here, a court is confronted with transactions that on any view are predominantly foreign, it must seek to determine whether Congress would have wished the precious resources of the United States courts and law enforcement agencies to be devoted to them rather than leave the problem to foreign countries."). It is far from clear that these resources would be well spent on all the potential disputes in which domestic conduct makes a relatively small contribution to securities fraud that occurs elsewhere.[2]

Were it not for the Second Circuit's preeminence in the field of securities law, and our desire to avoid a multiplicity of jurisdictional tests, we might be inclined to doubt that an American court should ever assert jurisdiction over domestic conduct that causes loss to foreign investors. It is somewhat odd to say, as *Bersch* and some

other opinions do, that courts must determine their jurisdiction by divining what "Congress would have wished" if it had addressed the problem. A more natural inquiry might be what jurisdiction Congress in fact thought about and conferred. Congress did not think about conduct here that contributes to losses abroad in enacting the Securities Exchange Act of 1934; it could easily provide such jurisdiction if that seemed desirable today. But, for the reasons just given, we defer to *Bersch* and the later Second Circuit cases and adopt the Second Circuit's approach. We are not persuaded by the reasoning of those circuits that have broadened federal court jurisdiction for reasons that are essentially legislative. In *Continental Grain,* the court said, "[w]e frankly admit that the finding of subject matter jurisdiction in the present case is largely a policy decision." 592 F.2d at 421. Yet Congress is available to make any policy decisions that are required. In *Kasser,* similarly, the court justified its approach in part because "[f]rom a policy perspective, and it should be recognized that this case in a large measure calls for a policy decision, we believe that there are sound rationales for asserting jurisdiction." 548 F.2d at 116 (footnote omitted). Three rationales were offered. "First, to deny such jurisdiction may embolden those who wish to defraud foreign securities purchasers or sellers to use the United States as a base of operations." *Id.* Second, "[b]y finding jurisdiction here, we may encourage other nations to take appropriate steps against parties who seek to perpetrate frauds in the United States." *Id.* Finally, the court's action "will enhance the ability of the SEC to police vigorously the conduct of securities dealings within the United States." *Id.; see also Continental Grain,*

---

2. Given this concern, it would also seem counterproductive to adopt a balancing test, or any test that makes jurisdiction turn on a welter of specific facts. *See, e.g., Restatement (Second) of the Foreign Relations Law of the United States* § 403(2) (2d draft 1981). As we know from our experience in the extraterritorial application of antitrust law, such tests are difficult to apply and are inherently unpredictable. *See, e.g., Laker Airways Ltd. v. Sabena, Belgian World Airlines,* 731 F.2d 909, 948–53 (D.C.Cir.1984). They thus present powerful incentives for increased

litigation on the jurisdictional issue itself, which inevitably tends to defeat efforts to protect limited American judicial resources. A strong argument has also been made that balancing tests "are not faithful to the principle of comity among nations," for in practice they tend to deemphasize foreign sovereign interests and almost never lead a court to decline jurisdiction. *See* Note, *Predictability and Comity: Toward Common Principles of Extraterritorial Jurisdiction,* 98 Harv.L.Rev. 1310, 1323–25 (1985).

592 F.2d at 421–22 (approving and employing these same policy rationales). *Kasser* concluded: "We are reluctant to conclude that Congress intended to allow the United States to become a 'Barbary Coast,' as it were, harboring international securities 'pirates.' " 548 F.2d at 116.

We, too, are reluctant to conclude that Congress intended any such thing, but we are less reluctant to conclude that Congress in 1934 had no intention at all on the subject because it was concerned with United States investors and markets. That being so, *Kasser's* policy arguments may provide very good reasons why Congress should amend the statute but are less adequate as reasons why courts should do so. As the Supreme Court has said in another context, "[t]he responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: 'Our Constitution vests such responsibilities in the political branches.' " *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 866, 104 S.Ct. 2778, 2793, 81 L.Ed.2d 694 (1984) (quoting *TVA v. Hill*, 437 U.S. 153, 195, 98 S.Ct. 2279, 2302, 57 L.Ed.2d 117 (1978)). This is particularly the case since such an amendment providing jurisdiction over aspects of predominantly foreign transactions should take into account considerations of comity and foreign affairs. Those factors do not weigh heavily in this case but they may in others.[3]

▪ For these reasons we adopt what we understand to be the Second Circuit's test for finding jurisdiction based on domestic conduct: jurisdiction is appropriate when the fraudulent statements or misrepresentations originate in the United States, are made with scienter and in connection with the purchase or sale of securities, and "directly cause" the harm to those who claim to be defrauded, even if reliance and damages occur elsewhere. Indeed, we believe this test is only a slight recasting, if at all, of the traditional view that jurisdiction will lie in American courts only over proscribed acts done in this country.[4]

### III.

The application of these principles to Zoelsch's claims is not difficult. On review of defendant's motion to dismiss under Fed.R.Civ.P. 12(b) and for summary judgment, we assume the truth of the allegations in plaintiff's complaint and liberally construe the possible theories of liability asserted there. *See, e.g., Shear v. Nation-*

---

**3.** In this connection, there may be more reason to find jurisdiction in a case like *Kasser,* which was brought by the SEC, than in a case like the present one, brought by foreign private individuals. The SEC, while an independent agency, is a responsible governmental agency and will surely take into account in framing its enforcement actions any foreign policy concerns communicated to it by the Department of State. A private individual need not and often will not. A court can feel more comfortable asserting jurisdiction if it knows that foreign policy concerns can be accommodated by the plaintiff and are not left entirely to the court's untutored evaluation. Whether or not that consideration should be sufficient to allow jurisdiction in an SEC action that would not lie in a private action we need not decide.

**4.** Although at first glance this approach might be thought to collapse the jurisdictional issue together with the merits, it does not. Instead, it merely recognizes that the issue of federal jurisdiction over extraterritorial conduct, like other threshold issues, "in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, ... [but] often turns on the nature and source of the claim asserted."

*Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). And indeed, as the Supreme Court said in *Warth* about standing to sue, "the source of the plaintiff's claim to relief assumes critical importance with respect to the prudential rules of [judicial self-restraint] that, apart from Art. III's minimum requirements, serve to limit the role of the courts in resolving public disputes." *Id. See also Vencap,* 519 F.2d at 1011–14, 1016–18 (considering jurisdiction in light of the several theories of liability arguably proposed by the plaintiff). *Cf. Hagans v. Lavine,* 415 U.S. 528, 536–43, 94 S.Ct. 1372, 1378–82, 39 L.Ed.2d 577 (1974) (federal courts may consider the substance of a claim for relief in order to decide whether it is too insubstantial to support federal question jurisdiction).

It is also worth noting, of course, that the test we adopt here does provide jurisdiction whenever any individual is defrauded in this country, regardless of whether the offer originates somewhere else, for the actual consummation of securities fraud in the United States in and of itself would constitute domestic conduct that satisfies all the elements of liability.

*al Rifle Ass'n,* 606 F.2d 1251, 1253 (D.C. Cir.1979). Even in this light, it is clear that any actual defrauding of investors took place in West Germany, so that reliance and damages would have occurred there. We are therefore left to consider whether Zoelsch alleges any tenable theory of liability according to which AA–USA committed acts in this country that are "punishable" in the sense that they satisfy the other elements needed to establish liability under section 10(b) or Rule 10b–5.

One possible theory of liability that can be gleaned from the complaint is that AA–USA and GmbH are "branch establishments," parts of a single world-wide organization, so that one could be held liable for the other's fraudulent misrepresentations. *See* Complaint ¶¶ 2, 3, 6, 11, J.A. at 13–14, 15, 17. But Zoelsch has not raised this argument on appeal, and appears not to dispute that AA–USA and GmbH are completely separate legal entities. *See* Affidavit of Jon N. Ekdahl, J.A. at 144–45.

The only other theory of liability that we find in the complaint, and the essence of Zoelsch's position on appeal, is that AA–USA acted willfully or recklessly by either misrepresenting or omitting to state material facts that it knew, in response to inquiries made by GmbH. Complaint ¶ 51, J.A. at 47. The complaint indicates that AA–USA could foresee that its misrepresentations or omissions might affect future purchasers of securities. *Id.* ¶ 53, J.A. at 48. Zoelsch also alleges that those misrepresentations or omissions were in fact one of the causes of the damage he and the other investors suffered when they were defrauded. These actions by AA–USA from the basis of Zoelsch's claims of securities fraud under section 10(b) and Rule 10b–5 and for aiding and abetting such fraud. *See generally id.* ¶¶ 48–57, J.A. at 46–49.

■ These allegations, even if true, are insufficient to support jurisdiction under the test we have enunciated. At the most, they establish that AA–USA made misrepresentations to GmbH that GmbH credited in drawing up its audit report. AA–USA's statements were not themselves made for distribution to the public, and were not transmitted to the public. AA–USA was merely one of the sources GmbH consulted in conducting the investigations which culminated in its audit report. That report, which was circulated to investors as part of the larger package of materials distributed by Loescher, was prepared and certified by GmbH alone. *See* J.A. at 76.

On these allegations, any misrepresentations made by AA–USA would not have been made "in connection with the purchase or sale of any security" as required for liability by section 10(b) and Rule 10b–5. The Ninth Circuit confronted a similar situation in *Wessel v. Buhler,* 437 F.2d 279 (9th Cir.1971). An accountant prepared financial statements for a corporation. The corporation later issued prospectuses that became the grounds for claims of securities fraud. Those prospectuses did not include as part of the package the financial statements that had been prepared by the accountant, though apparently some of the figures in the prospectuses were based on figures contained in those financial statements. Plaintiffs sought to fasten liability upon the accountant by claiming either that his financial statements were made in connection with the purchase and sale of a security or that he knew or should have known the statements would be used in preparing later prospectuses. *Id.* at 281.

The court rejected both theories, noting that although the "in connection with" requirement has been broadly construed, "its reach is not boundless." 437 F.2d at 282. The court found that the accountant's statements were not publicly disseminated or made in any way to influence investors, but were merely prepared in response to requests by the client corporation. Thus they were not made at the time "in connection with" any later sale. *Id.* The court also refused to make liability turn on whether the accountant could have known that his figures might be used in some later prospectus. Instead, the court held that the accountant could not be held liable for securities fraud where he did not prepare any part of the later prospectus, and

therefore was not responsible for its contents. *Id.* at 282–83.

The same reasoning applies here. AA–USA is not alleged to have prepared or certified any part of the audit report that was distributed to the investors. None of its statements are alleged to have reached those investors. We decline to find the "in connection with" requirement satisfied by statements made privately to an accounting firm that it may have credited later when it put together an audit report that was distributed to investors. *Cf. SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 862 (2d Cir.1968) ("Rule 10b–5 is violated whenever assertions are made, as here, in a manner reasonably calculated to influence the investing public, *e.g.,* by means of the financial media"), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).[5]

To put the matter in the Second Circuit's terminology, AA–USA's alleged misrepresentations to GmbH were "merely preparatory" to any fraud perpetrated on West German investors, and did not "directly cause" their losses. *Bersch,* 519 F.2d at 992–93. *Bersch*'s facts are very like the facts in this case. There, as here, the prospectuses for the securities offerings were distributed exclusively outside the United States. Likewise, also, the issuance was made only to persons who resided outside this country. On these facts, the court refused to take jurisdiction over the accountants who prepared the financial statements for the prospectuses, finding that the American activities "are merely preparatory or take the form of culpable nonfeasance and are relatively small in compari-

son to those abroad." *Id.* at 987. The biggest difference between the two cases, however, and one which makes Zoelsch's claim of jurisdiction much weaker even than that in *Bersch,* is that here AA–USA did not even prepare or audit the financial statements for the prospectus that was distributed to the West German investors. Indeed, *Bersch* declined jurisdiction over the accountants even though it appeared that parts of the financial statements that were issued to investors in the prospectus actually had been prepared in the United States. *See id.* at 985 n. 24; *see also id.* at 987 ("The fraud, if there was one, was committed by placing the allegedly false and misleading prospectus in the purchasers' hands. Here the final prospectus emanated from a foreign source.").

■ The *Wessel* decision also forecloses Zoelsch's claim that AA–USA aided and abetted securities fraud. That decision specifically denied that such liability could attach when the accountant defendant was not in any way responsible for including misleading figures in prospectus materials that were distributed to investors. *See* 437 F.2d at 283. Nor was the court willing to find liability based on the accountant's failure to disclose to investors that the prospectus contained misleading figures. "On the contrary, the exposure of independent accountants and others to such vistas of liability, limited only by the ingenuity of investors and their counsel, would lead to serious mischief." *Id.*

We endorse these principles. The Supreme Court has stated that to aid and abet another it is necessary that a defendant

---

5. Another way to express this point is in terms of causation. The Second Circuit has held that to recover under § 10(b) a plaintiff must show not only that the fraud caused economic harm, or "loss causation," but also that the fraud caused the plaintiff to engage in the transaction in question, which is "transaction causation." Under the Second Circuit's test, GmbH's audit report may have "induc[ed] the plaintiff to enter into a transaction," but AA–USA's statements, which were never distributed to investors, did not. *Manufacturers Hanover Trust Co. v. Drysdale Securities Corp.,* 801 F.2d 13, 20 (2d Cir. 1986), *cert. denied,* — U.S. —, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987); *see also Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 943 (2d

Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984); *First Fed. Sav. & Loan Ass'n v. Oppenheim, Appel, Dixon & Co.,* 629 F.Supp. 427, 440–41 (S.D.N.Y.1986). However the point is categorized, the central distinction for our purposes is that between an auditor who certifies an audit report or issues financial statements for public use, thereby assuming a peculiarly public status, and individuals who answer private inquiries without thereby establishing any particular relationship with the investing public. *See, e.g., Drake v. Thor Power Tool Co.,* 282 F.Supp. 94, 104 (N.D.Ill.1967); *Reingold v. Deloitte Haskins & Sells,* 599 F.Supp. 1241, 1259 (S.D.N.Y.1984).

" 'in some sort associate himself with the venture, that he participate in it as something that he wishes to bring about, that he seek by his action to make it succeed.' " *Nye & Nissen v. United States*, 336 U.S. 613, 619, 69 S.Ct. 766, 770, 93 L.Ed. 919 (1949) (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir.1938) (Hand, J.)). The Third Circuit, applying this approach to liability for securities fraud, has held that defendants are not liable under Rule 10b–5 where there is no allegation that they "proposed to bring about the publication of the false financials and the consequent fraud upon the stock purchasers." *Landy v. FDIC*, 486 F.2d 139, 164 (3d Cir.1973), *cert. denied*, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 313 (1974). Likewise, in this case AA–USA is not alleged to have played any part in publishing misleading statements to the public. As for liability for passive failure to disclose, other courts have held that inaction cannot create liability as an aider and abettor unless the defendant recklessly violates an independent duty to act or manifests a conscious intention to further the principal violation, *see Cleary v. Perfectune, Inc.*, 700 F.2d 774, 777–79 (1st Cir. 1983); *Harmsen v. Smith*, 693 F.2d 932, 944 (9th Cir.1982), *cert. denied*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983); *Cornfield*, 619 F.2d at 926–27; *Woodward v. Metro Bank*, 522 F.2d 84, 96–97 (5th Cir.1975), none of which has been alleged here.

Zoelsch offers one final argument that comes at jurisdiction from a very different angle. He asserts that we should consider all the activity that surrounds any given securities transaction as a single mass, and exercise subject matter jurisdiction over any individual defendant if we find that the sum of all the domestic activities by all participants in a string of transactions seems large enough to support jurisdiction in American federal courts. Thus we should take account of FAIR's domestic conduct in deciding whether to assert jurisdiction over AA–USA, even though FAIR is not even a party to this case, and there is no allegation that AA–USA acted in concert with FAIR to perpetrate a securities fraud. It is obvious that this suggestion is completely antithetical to the approach we have adopted here. It bears no relation to the tests for determining jurisdiction that have been adopted by any of the federal appellate courts. It is a novel theory and appears not to relate to the statute's purpose to protect American investors and securities markets. There seems nothing to recommend it. We therefore find no theory of liability in Zoelsch's complaint that supports American federal jurisdiction over the securities law claims brought against this defendant. The district court's decision is

*Affirmed.*

WALD, Chief Judge, concurring in the judgment:

I agree with the majority that the District Court properly dismissed this action for lack of subject matter jurisdiction. In reaching that result, I find it unnecessary, however, to adopt the Second Circuit's restrictive test for determining the extent of federal jurisdiction over securities law claims involving international transactions. It seems clear that, even under the less strict approach adopted by the Third, Eighth, and Ninth Circuits, AA–USA's alleged misrepresentations or omissions of material fact were so insignificant and so indirectly related to the overall fraudulent scheme as set out in the complaint that no federal jurisdiction would exist over Zoelsch's claims.

Furthermore, I cannot accept the majority's rationale for rejecting the jurisdictional standard adopted by the Third, Eighth, and Ninth Circuits. The majority characterizes those courts as having improperly engaged in judicial activism by "broaden[ing] federal court jurisdiction for reasons that are essentially legislative." Maj. op. at 32. Those courts were faced, as we are, with a question of statutory interpretation for which the language of the statute and its legislative history provide little guidance. It is clear that "[f]ifty years ago, Congress did not consider how far American courts should have jurisdiction to decide cases involving predominantly foreign securities transactions with some link to the United

States." Maj. op. at 30. In such circumstances, courts properly look to the overall purposes of the statute in resolving an issue of statutory construction. The majority may disagree with the policy rationales offered by the other circuits, but its criticism of them as engaging in *ad hoc* judicial legislation is misplaced. The decisions cited by the majority as examples of judicial lawmaking clearly indicate that the policies adopted are those the court perceives as most consistent with the intent of Congress in enacting the federal securities laws. *See, e.g., SEC v. Kasser,* 548 F.2d 109, 116 (3d Cir.) ("the antifraud provisions of the 1933 and 1934 Acts were designed to insure high standards of conduct in securities transactions within this country in addition to protecting domestic markets and investors from the effects of fraud"), *cert. denied,* 431 U.S. 938, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977). I therefore wish to distance myself from the majority's labeling of these courts' efforts as an attempt to usurp the role of Congress.