**CL–ALEXANDERS LAING &
CRUICKSHANK, Plaintiff,**

v.

**Bertha GOLDFELD, in her Capacity as
Preliminary Executrix of the Estate of
Seymour B. Goldfeld, Goldfeld and
Charak, Laura Katz, in her Capacity as
Preliminary Executrix of the Estate of
Hyman Katz, Arthur Andersen & Co., a
Partnership Organized Under the Laws
of Illinois, and Arthur Andersen & Co.,
a Partnership Organized Under the
Laws of the United Kingdom, Defendants.**

No. 87 Civ. 6113 (MBM).

United States District Court,
S.D. New York.

March 31, 1989.

---

Jerome M. Congress, Krishnan S. Chittur, Milberg Weiss Bershad Specthrie & Lerach, New York City, for plaintiff.

James D. Zirin, James J. Sabella, Jill I. Braverman, Breed, Abbott & Morgan, New York City, for defendants Arthur Andersen (U.S.) and Arthur Andersen (U.K.).

Thomas F. Breen, D'Amato & Lynch, New York City, for defendants Seymour B. Goldfeld and Goldfeld and Charak.

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiff CL–Alexanders Laing & Cruickshank ("Alexanders"), a London investment banker, sues on behalf of a class of British citizens and institutions who bought two million shares in Container Industries, Inc. ("Container"), a Delaware corporation with its principal place of business in New Jersey. The purchase, part of a private placement, was made in Great Britain in June 1986. Plaintiff hired defendant Arthur Andersen & Co. of England ("Andersen–U.K.") to provide a "comfort letter" [1] for inclusion in the prospectus. Plaintiff alleges that defendant Arthur Andersen & Co., an Illinois corporation ("Andersen–U.S."), substantially assisted Andersen–U.K. in the preparation of the comfort letter. The parties have stipulated that, for purposes of this case, Andersen–U.K. and Andersen–U.S. are part of one international organization. Defendants Seymour B. Goldfeld and

Hyman Katz, now both deceased, served as Container corporate officers. Defendant Goldfeld and Charak, a New York law firm and Container's legal counsel, provided an opinion letter warranting that there were no material misstatements or omissions in the prospectus.

Plaintiff charges that defendants conspired to issue misleading and false statements about Container's sales projections for its "Exxel" self-pressurized spray containers; plaintiff's primary claim arises under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982), Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 (1989), with attendant claims for breach of contract and fraud. Additionally, plaintiff claims that Katz violated § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l(2) (1982) and that Andersen breached its fiduciary duty to plaintiff. Defendants Goldfeld, the firm of Goldfeld and Charak, Andersen–U.S. and Andersen–U.K. move to dismiss the complaint for lack of subject matter jurisdiction under the securities laws and, in the alternative, on grounds of *forum non conveniens*. For the reasons stated below, defendants' motion is denied.

## I.

To determine whether subject matter jurisdiction exists, this court may consider facts outside the pleadings, *Exchange Nat'l Bank v. Touche Ross & Co.*, 544 F.2d 1126, 1131 (2d Cir.1976), construing them in the light most favorable to plaintiff. *AVC Nederland B.V. v. Atrium Inv. Partnership*, 740 F.2d 148, 149 (2d Cir.1984). Although both sides argue the lawsuit's merits, notably whether Andersen warranted only that the sales projections were consistent with the company's assumptions or whether Andersen warranted also that the projections were reasonable, only the jurisdictionally relevant facts will be considered.

---

**1.** "Comfort letters," originally known as "cold comfort letters," usually accompany the audited financial statements for the company. H. Bloomenthal, 3A *Securities and Federal Corporate Law*, § 8.16[3][b] (Rev.1988). The letter contains whatever assurances the accountant is willing to provide with respect to the reliability of the financial statements. The usual force of these assurances and their effect on a prospective investor may account for the term "cold comfort letter."

Container was incorporated in Delaware in 1980, with its principal place of business in New Jersey. It developed in 1983 and marketed in 1985 a non-aerosol spray container called "Exxel" intended for personal care, household, and pet care products. In the spring of 1986, representatives of Alexanders and Container agreed to the private placement of two million shares of Container common stock, with warrants to buy an additional one million shares. Container management prepared 1986 sales projections for inclusion in the prospectus. Alexanders retained Andersen–U.K. to review these projections and provide a "comfort letter," also for inclusion in the prospectus.

Richard Reichter of Eaton Financial Management Corp., a Massachusetts-based company later named financial advisor to the placing, first suggested that Container pursue a foreign private placement. Hyman Katz, founder and chief executive of Container, accepted the proposal and entered into an agreement with Reichter. (Congress Aff., Exh. 1) Plaintiff claims that most of Reichter's letters to Katz emanated from his Massachusetts office, pointing in particular to a letter dated January 15, 1986 regarding Katz's trip to London to meet various potential British underwriters, including Alexanders. Although the letterhead lists a Massachusetts address, Reichter refers in the letter to his London flat. (Congress Aff., Exh. 2) Furthermore, defendants argue that Reichter's contacts with Julian Benson of Alexanders were mostly in London. (Zirin Aff., Exh. 3 (Benson Dep. at 53–54)) For purposes of subject matter jurisdiction, however, I find most persuasive Benson's statement, when asked whether Reichter spent more time in Massachusetts or London, that Reichter "spent most of his time between the two" (*Id.* at 53), signifying that Reichter spent as much time in the United States as in England.

Katz and other Container officers met Alexanders' representatives in London. In March 1986, Alexanders representatives travelled to New Jersey to meet with Container's senior officers and Reichter, to examine the company's plant and equipment and to discuss the private placement.

(Congress Aff., Exh. 3 (Benson Dep. at 105–06)). During that visit, plaintiff met an Andersen–U.S. partner, Joseph Whalen, at a dinner party. *Id.* at 108–110. There is no evidence, however, that Whalen and Benson had any significant conversations then about Container.

In April 1986, Alexanders retained Andersen–U.K. to review Container's finances and issue a "comfort letter" for inclusion in the prospectus. Alexanders' Benson testified that Container's first contact with Andersen to discuss retaining the accounting firm was with Andersen–U.S. in New Jersey. (Congress Aff., Exh. 3 (Benson Dep. at 166)) Although Andersen–U.K. had ultimate engagement responsibility for the placement acting as "co-ordinat[or]" (Zirin Aff., Exh. 7), and indeed drafted the comfort letter, *Id.* at 2, "the initial review of the projections and the documentation to be prepared [were] performed by the Roseland [New Jersey] office." This made sense, as one Andersen–U.K. internal memorandum noted, because "Container Industries is an audit client of [the] New Jersey office, the last financial statements reported on being those for the year ended 31 December 1985." (Congress Aff., Exh. 29 at 1) The memorandum reported that "New Jersey office (Joe Whalen and Tony DiMichele, partner and manager respectively) have been responsible for the review of the 1986 projections."

Indeed, Andersen–U.K.'s reliance on Andersen–U.S. is clearly revealed in both the draft retainer agreement and the cover letter it sent Alexanders. Thus, the cover letter notes that "I [David Kirk of Andersen–U.K.] will be in touch as soon as we have further information from our colleagues in New Jersey." (Congress Aff., Exh. 8) The draft retainer agreement notes at the end that, if Alexanders has any "questions *regarding these arrangements* please contact either Bob Linger or David Kirk in London and Joe Whalen or Tony DiMichele in New Jersey." (Congress Aff., Exh. 8 at 2 (emphasis added)) Benson testified that Andersen–U.K. told him that "while the London office would be the prime route of communication on this

matter, much of the work would be done in New Jersey." (Congress Aff., Exh. 3 (Benson Dep. at 184))

Andersen–U.K. sent several telexes directing Andersen–U.S. to perform specified field work to test Container's projections. (Zirin Aff. Exh. 11 (Whalen Dep. at 8–9, 14–15, 30–31, 43, 137); Exh. 13 & 14) Andersen–U.K. sent Andersen–U.S. professional literature on Great Britain standards for accountants. (Zirin Aff., Exhs. 16–19) Kirk of Andersen–U.K. visited the Roseland office to review the field work performed, so that he could draft the comfort letter. (Zirin Aff., Exh. 11 (Whalen Dep. at 76–78, 137)) Plaintiff has certified to this court that the work papers and other documentation show that "virtually all the work" on Container's sales projections was done by Andersen–U.S. (Memorandum of Pltf. in Opposition to Motions to Dismiss at 12 n. *)

On May 16, draft projections, corresponding to the unit sale, revenue, and income projections contained in the prospectus, were telecopied from Roseland to Andersen–U.K. (Congress Aff., Exh. 26 at 7) A copy of those projections is in Alexanders' files, and Alexanders claims it relied on them in deciding to go forward with the placement. Those projections are also reproduced verbatim in the prospectus. (*Compare* Congress Aff., Exh. 18 at 149 *with* Congress Aff., Exh. 19, at 22)

Further, Andersen–U.S. personnel assisted Katz in preparing the list of assumptions accompanying the projections. Andersen–U.S.'s DiMichele wrote the original assumptions following discussions with Katz. (Congress Aff., Exh. 5 (DiMichele Dep. at 57)) After these were forwarded to Andersen–U.K. for comment, DiMichele worked with Katz to prepare a revised set of assumptions. *Id.* at 59–60. These were sent to Andersen–U.K. for inclusion in the prospectus. (Congress Aff., Exh. 9 at 2–3)

It is undisputed, however, that Andersen–U.K. retained responsibility for drafting the comfort letter. What is disputed— and oddly, between two Andersen–U.S. Roseland employees—is whether the Rose-

land office ever reviewed the document. Whalen has testified that the report on the projections was "strictly a product of the UK firm" and that he had "nothing to do with drafting the report" (Zirin Aff., Exh. 11 (Whalen Dep. at 76–77, 88)); indeed, Whalen claims he never saw a draft of it. *Id.* at 76–77. DiMichele claims he received and reviewed the draft in New Jersey and discussed it with both Linger and Kirk from the London office. (Congress Aff., Exh. 5 (DiMichele Dep. at 55–57))

Linger signed Andersen's report (Zirin Aff., Exh. 23); Andersen–U.K. also signed a consent to having its report appear in the prospectus. (Zirin Aff., Exh. 24)

On June 9, 1986, Container entered a written placement agreement with Alexanders. (Congress Aff., Exh. 27) In that agreement, Katz and Goldfeld warranted that the prospectus was true, complete and accurate. The shares were not registered with the United States Securities and Exchange Commission (Zirin Aff., Exh. 3 (Benson Dep. at 328)), and, in an effort to avoid application of the United States securities laws, Container and Alexanders agreed that Alexanders would offer securities only to institutions and investors in Great Britain. (Zirin Aff., Exh. 5) Indeed, the prospectus dated June 9, 1986 required purchasers of the shares to promise that they would not resell such shares in the United States or to any entity organized under the laws of the United States (Zirin Aff., Exh. 6 at 34) The prospectus also stated, however, that Container would file by April 1, 1987 a registration statement under the Securities Act of 1933 (*Id.*), thereby allowing sales of the shares to United States citizens.

■ The New York law firm of Goldfeld and Charak provided a letter opinion to plaintiff dated June 30, 1986 warranting that the prospectus had no material misstatements or omissions. (Congress Aff., Exh. 28 at 880) Although the placement actually closed on June 27 rather than June 30, Benson testified that he was expecting the letter and relied on it to close the deal.[2]

2. Defendant Goldfeld and Charak argues that,   because the opinion letter did not arrive until

(Congress Aff., Exh. 3 (Benson Dep. at 275))

\*   \*   \*

■ The Second Circuit prescribes two tests for determining whether to apply the federal securities laws to foreign sales of securities: the "effects" test, *Schoenbaum v. Firstbrook,* 405 F.2d 200, 209 (2d Cir.), *partially rev'd on other grounds,* 405 F.2d 215 (1968) (*en banc* ), *cert. denied,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969), and the "conduct" test, *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974, 993 (2d Cir.), *cert. denied,* 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975). Because all purchasers in this placement are foreign, plaintiff has concentrated on showing that conduct occurred in the United States that was part of the fraudulent scheme. *Psimenos v. E.F. Hutton & Co.,* 722 F.2d 1041, 1045 (2d Cir.1983).

Defendants would portray this as a case populated entirely by foreign actors engaged in foreign conduct: foreign purchasers, foreign placement of foreign securities, foreign communications regarding the deal, foreign preparation and issuance of the prospectus, foreign drafting of Andersen's comfort letter. Defendants assert that *Bersch, supra,* and *Zoelsch v. Arthur Andersen & Co.,* 824 F.2d 27, 29–30 (D.C. Cir.1987), are dispositive. In *Bersch,* 519 F.2d at 985 n. 24, 987, the Second Circuit declined subject matter jurisdiction over securities law claims brought by foreign purchasers of a Canadian corporation's stock, even though two of the six underwriters were American banking houses, parts of the prospectuses were drafted in New York, and an American accounting firm was retained; the stock was traded only on foreign exchanges. Judge Friendly described the activities in the United States as "merely preparatory" to the alleged fraud because they were "relatively small in comparison to those [activities] abroad" and did not "directly cause" the losses elsewhere, *Bersch,* 519 F.2d at 987, 992–92; rather, the fraud "was committed by placing the allegedly false and misleading prospectus in the purchasers' hands. Here the final prospectus emanated from a foreign source." *Bersch,* 519 F.2d at 987. Here too, defendants claim, although some preparatory work was done in the United States, the prospectus, including the comfort letter, emanated from a foreign source.

In *Zoelsch,* 824 F.2d at 35, Judge Bork, applying the Second Circuit standard enunciated in *Bersch* and its progeny, found no subject-matter jurisdiction in a lawsuit brought by West Germans who invested in a West German limited partnership with the understanding that the funds would then be invested in a United States limited partnership. The only defendant in the lawsuit was Andersen–U.S. which had provided information to Arthur Andersen & Co. of Germany. Andersen–Germany had then incorporated that information into its audit report on the West German partnership. Because Andersen–U.S. was "merely one of the sources [Andersen–Germany] consulted in conducting the investigations which culminated in its audit report" and it never actually transmitted the information to the plaintiffs, *Zoelsch,* 824 F.2d at 34, he found jurisdiction wanting. Indeed, he found Zoelsch's claim even weaker than the unsuccessful claim in *Bersch* because

---

after the closing date, it could not have been relied on by plaintiff; thus, the law firm contends, there has been no showing of transaction causation with respect to its opinion letter. *Bennett v. United States Trust Co.,* 770 F.2d 308, 313 (2d Cir.1985), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986); *see generally Wilson v. Ruffa & Hanover, P.C.,* 844 F.2d 81, 85–86 (2d Cir.1988) (discussing the related requirements of loss causation and transaction causation). However, the opinion letter did not contain any factual statements regarding the company; rather, it warranted the truthfulness of the disclosures in the prospectus. Thus, Ben-

son's claim that Alexanders was expecting the letter and thus relied on its warranty is sufficient at this point to meet the requirement for transaction causation.

In its reply brief on this motion, the law firm also argues that, in a class action, plaintiff must prove that each investor objectively relied on its opinion letter. By letter dated February 23, 1989, plaintiff has requested that it be allowed to fully brief this issue. This question is one more properly part of the motion to certify the class, now held in abeyance, and will be considered on that motion, not now.

*Bersch* at least involved drafting of the prospectus in the United States and a United States accounting firm. *Zoelsch*, 824 F.2d at 35.

Defendants Andersen–U.K. and Andersen–U.S. argue that here, as in *Zoelsch* and *Bersch*, no fraudulent statements were communicated by them from the United States; rather, Andersen–U.S. merely provided field assistance supervised by Andersen–U.K., the author and signer of the comfort letter. Thus, defendants argue, by the Second Circuit standard which requires that the "domestic conduct [comprise] all the elements of a defendant's conduct necessary to establish a violation of section 10(b) and Rule 10b–5: the fraudulent statements or misrepresentations must originate in the United States, must be made with scienter and in connection with the sale or purchase of securities, and must cause the harm to those who claim to be defrauded, even though the actual reliance and damages may occur elsewhere," *Zoelsch*, 824 F.2d at 31, plaintiff's assertion of jurisdiction must fail.

Defendants argue that if they can be sued in this case based on the conduct of Andersen–U.S. in this country, then any foreign accounting firm that delegates field work to a related domestic firm could be haled into a United States court to answer for securities law violations if that field work is incorporated in the information distributed to foreign investors. That result, defendants argue, would offend common sense, comity and precedent. The spectre defendants have conjured is indeed frightening, particularly to an accountant, but it is not this case. Here I find *IIT, an Int'l Inv. Trust v. Cornfeld*, 619 F.2d 909, 920–21 (2d Cir.1980), instructive. In *Cornfeld*, a Luxembourg investment trust claimed it was defrauded when it purchased Eurodollar debentures of a Netherlands Antilles corporation. Judge Friendly found jurisdiction for several reasons, distinguishing the facts there from those in *Bersch*. First, unlike *Bersch*, the obligations offered in *Cornfeld* were really American securities: although the obligations were nominally of a Netherlands Antilles corporation, that corporation was wholly owned

by a United States corporation, and the offering in suit was coordinated with a securities offering in the United States. *Cornfeld*, 619 F.2d at 919–20. Judge Friendly concluded that "[w]e think Congress would have been considerably more interested in assuring against the fraudulent issuance of securities constituting obligations of American rather than purely foreign business." *Cornfeld*, 619 F.2d at 920.

Second, Judge Friendly noted that there was greater evidence in *Cornfeld* than in *Bersch* of conduct in the United States. Two of the *Bersch* banking houses were American; the only underwriter in *Cornfeld* was American. "Perhaps most important of all," Judge Friendly found,

a consequence of the ... debentures being essentially of an American security is that activities occurring in the United States, which on their surface may appear similar to those held in *Bersch* to be 'merely preparatory' and thus insufficient to have 'directly caused' loss to foreigners, assume a different aspect. The fact that the drafting of the final prospectus in *Bersch* was done in Europe was not just 'a formal or ultimate act ... staged in Europe', as the *Bersch* district court found.... The *Bersch* prospectus was mainly drafted in Europe because that was where IOS' records and principals were. Here the prospectus was wholly drafted in the United States because the offering, for largest part in form and for all in substance, was of securities of an American based corporation. Similarly, while there was some domestic accounting work in *Bersch* ... most of the field work was and in the nature of things had to be done abroad. Here all the accounting work was and had to be done in the United States.

*Cornfeld*, 619 F.2d at 920. Thus, the fact that the securities were really American logically meant that the alleged fraudulent conduct must have occurred predominantly in the United States.

Both *Cornfeld* factors are present here. First, although the prospectus recited that no sales could be made to United States investors, it stated also that Container

would register the securities with the United States Securities and Exchange Commission by April 1, 1987, thus allowing United States investors to buy the securities. Defendants urge that such sales were a mere possibility; but the mandate that Container register here demonstrates the parties' abiding intention that the securities be sold here within a year of the initial placement. This makes sense because the obligations, after all, were of a United States corporation—Container. Following *Cornfeld*'s mandate that courts consider the "real facts," 619 F.2d at 920, *see also AVC Nederland*, 740 F.2d at 155 (issuer, while nominally American, was really Dutch because both partners were Dutch citizens), the real fact is that these were obligations of an American company. As Judge Friendly commented, Congress has a greater interest in assuring against fraud in the issuance of "obligations of American rather than purely foreign business." *Id.* (emphasis added)

Moreover, Container stock is traded on the New York over-the-counter market. Generating development funds for Container in the transaction at issue is important to the continuing value of the stock traded in the United States. *See Cornfeld*, 619 F.2d at 920 (fact that securities were in substance American is relevant under the *Schoenbaum* "effects" test because it shows potential impact on United States investors).

The second factor—the conduct here relative to the conduct abroad—also favors asserting jurisdiction precisely because the securities involved here were American, as Judge Friendly concluded in *Cornfeld*. Katz, Goldfeld, and the law firm of Goldfeld and Charak all engaged in allegedly fraudulent activities from the United States. Katz and Goldfeld met with plaintiff's representatives in New Jersey; Goldfeld and Charak's opinion letter was sent to

plaintiff from New York. Reichter's activities are without jurisdictional significance, as he seems to have divided his time equally between his London flat and his Massachusetts office. That some of the negotiations for the deal were in London and that Andersen–U.K. issued its comfort letter from London does not change the fact that a preponderance of the fraudulent statements alleged here emanated from the United States.

■ Defendants Andersen–U.S. and Andersen–U.K. argue that the activities of the other defendants may not be considered in determining whether subject-matter jurisdiction is proper; rather, subject-matter jurisdiction must be assessed against each defendant by reference only to that defendant's activities. I disagree. Plaintiff's complaint clearly alleges that defendants conspired and aided and abetted one another to commit securities fraud violations. *See, e.g.*, First Amended Complaint at ¶ 55. Moreover, plaintiff has presented sufficient evidence on this motion that all the defendants discussed various aspects of the allegedly misleading sales projections. Thus, the activities of the other defendants may be considered in determining whether subject matter jurisdiction is proper. *Compare Zoelsch*, 824 F.2d at 36 (fraudulent conduct of American participants in fraud not considered in determining subject matter jurisdiction because they were not parties to the action and plaintiff failed to allege that defendant acted in concert with others).

Andersen correctly notes that field work in the United States, standing alone, is not enough to justify the exercise of jurisdiction by an American court; some fraudulent statement must be alleged to have been communicated from this country.[3] However, we are dealing here with more

---

**3.** In this regard, plaintiff's argument to the contrary is misplaced. In *AVC Nederland*, although the fraud was not consummated in the United States, plaintiff alleged that misrepresentations were made in the United States when its financial representative came to New York to negotiate the deal. 740 F.2d at 148. Indeed, plaintiff has not found, nor has this Court, any case where subject matter jurisdiction was held proper under the "conduct" test merely because fraudulent statements were prepared in the United States. Rather, there must be some allegation that misrepresentations were made in the United States to plaintiff or were communicated from here.

than mere field work in this country. First, the complaint alleges that other defendants related in various ways to the U.S. corporation committed fraudulent acts in this country. Moreover, the fact that the securities are essentially American required that most of Andersen's auditing occur here. Indeed, the financial figures sent by Andersen–U.S. to London appear verbatim in the prospectus. Personnel from London visited Andersen–U.S.'s office because they had to: all their previously-obtained information on the company was there and, as the company was there, so all new information had to be collected there. That Andersen attempted to structure its operations so that the audit results were communicated abroad does not alter the calculus. When substantial preparation of the audit is coupled with the other defendants' activities in the United States and the securities are those of a domestic company, subject matter jurisdiction is warranted. In such circumstances, no amount of structuring can alter the essentially American nature of the fraud here.

There is a certain tension between Zoelsch and Cornfeld because both involved securities which, although nominally foreign, were in reality American. Yet the Second Circuit found jurisdiction in Cornfeld but the D.C. Circuit found no jurisdiction in Zoelsch. In Cornfeld, the securities were those of a wholly-owned subsidiary of an American corporation, such that the foreign investors knew they were investing in that American corporation. Similarly, in Zoelsch, the West German investors, while nominally investing in a West German limited partnership, knew that the funds were destined for investment ("channelled" in the words of Judge Bork) in an American limited partnership. These different outcomes may be explained either by distinguishing details in the two cases, or by a doctrinal difference between the two courts. Thus, it may be that discovery was not as extensive in Zoelsch as in Cornfeld and thus Andersen–U.S.'s role in the final

audit report was not fully revealed, or that plaintiff in Zoelsch failed to argue that Andersen–U.S. and Andersen–Germany were part of a single international organization,[4] 824 F.2d at 34, and failed either to sue the American actors or claim that Andersen–U.S. acted in concert with them, 824 F.2d at 36, or that the Zoelsch court may have felt the West German partnership was not a mere shell akin to the foreign subsidiary in Cornfeld.

Alternatively, the panel in Zoelsch may have applied a more restrictive interpretation of Second Circuit case law. Elsewhere in the opinion, Judge Bork questions whether it is appropriate for courts to assert subject matter jurisdiction in cases where no United States investors are injured or affected. Because the legislative history is silent in this regard, Judge Bork notes, the Second Circuit engaged in the "dubious" task, as he saw it, of divining whether Congress would have intended that the securities laws cover fraudulent conduct here which affects only persons abroad. See Zoelsch, 824 F.2d at 30 ("Were it not for the Second Circuit's preeminence in the field of securities law, and our desire to avoid a multiplicity of jurisdictional tests, we might be inclined to doubt that an American court should ever assert jurisdiction over domestic conduct that causes loss to foreign investors."). To the extent that the test in Zoelsch is more restrictive than that in Cornfeld and other Second Circuit precedent, this court is bound by Cornfeld and its progeny.

For example, the Second Circuit has endorsed the test in the Restatement of the Foreign Relations Law of the United States for determining whether subject matter jurisdiction is appropriate. AVC Nederland B.V., 740 F.2d at 153. The D.C. Circuit in Zoelsch explicitly rejected it. 824 F.2d at 32 n. 2. Section 416 of the Restatement (Third) of the Foreign Relations Law of the United States (1986) would

---

4. Here the parties have stipulated that Andersen–U.S. and Andersen–U.K., for purposes of this case only, may be considered part of a single international organization. (Zirin Aff., Exh. 2).

support a finding of jurisdiction here. Both subsections (b) and (c) of § 416(2) [5] support such a finding here, because most misrepresentations emanated from here and all defendants, with the exception of Andersen–U.K., are United States nationals. Looking to § 403(2)'s [6] balancing test to see if the assertion of jurisdiction would be reasonable, I find that subsections (a) and (b) strongly support jurisdiction, (g) and (h) may slightly oppose jurisdiction, while the other sections are either neutral or not relevant. The exercise of subject matter jurisdiction is thus appropriate. *Accord AVC Nederland B.V.*, 740 F.2d at 154–55.

## II.

■ Even if subject matter jurisdiction exists, defendants contend, the complaint should be dismissed on grounds of *forum non conveniens.* The Supreme Court requires that a court weighing such a motion consider both the private interests—convenience in gaining access to documents and witnesses for discovery and trial—and the public interest—whether there exists a local interest in the litigation, avoidance of unnecessary problems in conflict of laws or in the application of foreign law, and the unfairness of burdening the court and jury with a matter of foreign concern. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–9, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947). A trial court should not grant a *forum non conveniens* motion "unless the balance is strongly in favor of the defendant." *Gulf Oil Corp.*, 330 U.S. at 508, 67 S.Ct. at 843. Although a plaintiff's choice of forum will normally not be disturbed, this presumption is less weighty where, as here, the plaintiff is foreign. *Department of Economic Dev. v. Arthur Andersen & Co.*, 683 F.Supp. 1463, 1483 (S.D.N.Y.1988). "Nonetheless, the burden remains on the defendants to demonstrate why the presumption in favor of plaintiff's choice—a weakened presumption though it may be—should be disturbed." *Karvelis v. Constellation Lines, S.A.*, 608 F.Supp. 966, 972 (S.D.N.Y.1985), *aff'd*, 806 F.2d 49 (2d Cir. 1986), *cert. denied*, 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987).

Given allegations that the fraudulent conduct occurred mostly in the United States, it follows that most relevant documents and witnesses are here. Five of

**5.** Section 416(2) states:

Whether the United States may exercise jurisdiction to prescribe with respect to transactions or conduct other than those addressed in Subsection (1) depends on whether such exercise of jurisdiction is reasonable in the light of § 403, in particular

(a) whether the transaction or conduct has, or can reasonably be expected to have a substantial effect on a securities market in the United States for securities of the same issuer or on holding in such securities by United States nationals or residents;

(b) whether representations are made or negotiations are conducted in the United States;

(c) whether the party sought to be subjected to the jurisdiction of the United States is a United States national or resident, or the persons sought to be protected are United States nationals or residents.

**6.** Section 403(2) states:

Whether exercise of jurisdiction over a person or activity is unreasonable is determined by evaluating all relevant factors, including, where appropriate:

(a) the link of the activity to the territory of the regulating state, *i.e.*, the extent to which the activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory;

(b) the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated, or between that state and those whom the regulation is designed to protect;

(c) the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted;

(d) the existence of justified expectations that might be protected or hurt by the regulation;

(e) the importance of the regulation to the international political, legal, or economic system;

(f) the extent to which the regulation is consistent with the traditions of the international system;

(g) the extent to which another state may have an interest in regulating the activity; and

(h) the likelihood of conflict with regulation by another state.

the six defendants are in the United States. The company that issued the securities is here, so the audit was primarily done here, and Goldfeld and Charak's opinion letter was sent from here. It is to be expected then that most of the documentation at issue is here. So are most of the witnesses in this matter—for example, Container corporate officers, Andersen–U.S. employees, and the law firm. Non-party witnesses—mainly buyers whose purchase orders Container relied on in setting its sales projections—are also here. Furthermore, contrary to defendants' contention, Reichter operates on both sides of the Atlantic Ocean, with an office in Massachusetts. Although plaintiff's representatives and Andersen–U.K.'s officers are abroad, and this will cause some inconvenience, I find that, by far, most relevant witnesses are here. The evidence in the U.S. is crucial to this case because most of the witnesses who were involved in the actual review and evaluation of the allegedly misleading projections are located here. Thus, I find that the private interest strongly supports continuing this action here.

The public interest factors in this case also favor retaining jurisdiction. Although Britain obviously has a strong public interest in protecting British citizens from alleged fraud perpetrated by British auditors, the United States has an equally strong interest in preventing alleged securities frauds planned and executed in the United States. Here, the securities were those of a United States corporation, and a United States auditing firm and New York law firm were intimately involved. Thus, the public interest too supports assertion of jurisdiction.

The public interest analysis is somewhat affected by the fact that British law affords an alternative forum for plaintiff. Defendants also correctly note that the mere invocation of United States securities laws by a foreign plaintiff is not sufficient to defeat a *forum non conveniens* motion. *Fustok v. Banque Populaire Suisse*, 546 F.Supp. 506, 514 (S.D.N.Y.1982) (Weinfeld,

J.). Nevertheless, the federal securities law claims are not mere window-dressing; rather, they are the heart of the complaint. Moreover, there is no fear here that the court will have to apply a foreign body of law to the pendent common law claims. Under New York choice of law rules, *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), because most of the fraudulent conduct occurred in the United States and five of the six defendants are domiciled here, either New Jersey or New York—but certainly not Britain—would have the predominant interest in regulating conduct such that either forum's laws should be applied. *See, e.g., American Protein Corp. v. AB Volvo*, 844 F.2d 56, 62–63 (2d Cir.) (applying New York law where defendant was New York resident and "many of the alleged misrepresentations originated in New York"), *cert. denied,* —— U.S. ——, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988). Thus, the public interest balance still weighs against dismissing this action.

As both the private interest and the public interest support retaining this action, defendants motion for dismissal on grounds of *forum non conveniens* must be denied.

### III.

In sum, defendants' motions to dismiss for lack of subject matter jurisdiction and on grounds of *forum non conveniens* are denied.

SO ORDERED.