**Jill E. WEHE, Plaintiff,**

v.

**Donald MONTGOMERY, Merrill Lynch, Pierce, Fenner & Smith, Incorporated, a Delaware corporation, Federal Insurance Company, a New Jersey corporation, Defendants.**

Civ. No. 88–1018–RE.

United States District Court,
D. Oregon.

Feb. 10, 1989.

James W. Hendry, Gilbertson, Brownstein, Rask, Sweeney, Kerr & Grim, Portland, Or., for plaintiff.

Robert Rosenthal, Michael P. Opton, Opton, Galton & Rosenthal, Portland, Or., for defendants.

## OPINION

REDDEN, District Judge:

### I. BACKGROUND

This case alleges federal and state securities violations, breach of fiduciary duty and professional negligence. Jill Wehe (plaintiff) alleges that defendants Merrill Lynch, Pierce, Fenner and Smith, Inc. (Merrill Lynch) and Donald Montgomery (Montgomery) failed to give her written statements disclosing the credit terms for margining securities. Plaintiff seeks to recover her net trading losses, approximately $46,000.

On April 2, 1981, plaintiff's grandfather, Gordan Duncan (Duncan), opened a custodial account for plaintiff with Merrill Lynch. Montgomery, a Merrill Lynch licensed securities broker and personal acquaintance of Duncan's, opened the account. Plaintiff was a minor at that time. In February 1982, Merrill Lynch received a letter requesting that the account name be changed to delete Duncan as custodian and substitute plaintiff as the sole owner. Merrill Lynch completed the requested name change in April 1982. In June 1985, plaintiff requested that her address replace Duncan's address. Plaintiff received the standard Merrill Lynch account statements from February 1982 through June 1983, and Cash Management Account (CMA) statements from July 1983 through February 1988, when she closed her account.

In June 1983, Duncan opened a CMA for plaintiff so that she could obtain additional services from Merrill Lynch (i.e., a credit card and checking account). On June 27, 1983, Duncan signed plaintiff's name followed by his initials to a CMA Agreement, VISA Account Agreement and Customer Agreement. The Customer Agreement contained an arbitration clause and a choice of law provision for New York state law.

After the CMA was established the plaintiff signed checks on the account and used the VISA card. In August 1985, through February 1988, the plaintiff purchased securities on margin.

### II. DEFENDANTS' MOTION TO STAY PROCEEDINGS

#### A. Is Plaintiff Bound to the CMA Agreement

##### 1. *Choice of Law*

 New York law determines the validity of the Agreement because paragraph 12 of the CMA states, "[t]his agreement and its enforcement shall be governed by the laws of the State of New York...." The Restatement (Second) of Conflicts § 187 rejects plaintiff's argument that since she did not sign the CMA Agreement, the Agreement cannot bind her for choice of law purposes. Comment d to § 187 states that when the formalities of a contract's formation are at issue, the choice of law provision in that contract may later be adjudicated invalid.

##### 2. *Discussion*

 Plaintiff alleges she is not bound to the CMA Agreement because she did not personally sign the Agreement nor was she given copies of either the CMA Agreement or the Customer Agreement. Plaintiff also alleges that she did not authorize Duncan

to sign for her as her agent or in any other capacity. Plaintiff states she "never made a purchase or sale of a security in her Merrill Lynch account with knowledge that the account agreement contained an arbitration clause."

Defendants argue plaintiff was a third party beneficiary of Duncan's Agreement with defendants. Under this theory, Duncan entered into a contract with defendants intended for plaintiff's benefit and plaintiff received the benefit of Merrill Lynch's services related to the CMA Agreement. Plaintiff argues she was not a third party beneficiary to the Agreement. Plaintiff states she is not contending that she did not have an agreement with the defendants, but maintains the terms of that agreement are limited to those terms plaintiff was made aware of.

I agree with defendants that plaintiff was a third party beneficiary to Duncan's Agreement with defendants. Plaintiff actively used the benefits of that CMA Agreement, both the checking account and the VISA card. Therefore the Agreement between the parties is binding on plaintiff, as beneficiary of the contract.

Defendants also cite various circuit and district court cases which all essentially hold that a signature to an arbitration agreement is not critical, more important are the parties' acts or conduct which indicate the parties are committed to the contract. *See Starkman v. Seroussi*, 377 F.Supp. 518, 522 (S.D.N.Y.1974) ("while an arbitration agreement must be in writing to be enforceable, there is no requirement that it be signed").

Further, *Genesco, Inc. v. T. Kakiuchi and Co., Ltd.*, 815 F.2d 840 (2d Cir.1987), held that it is not important whether there is subjective agreement as to each clause in the contract, but the focus must be on whether there was an objective agreement with respect to the entire contract. *Id.* at 846. Plaintiff's argument that while she might have agreed to some elements of the CMA Agreement, she did not agree to the CMA Agreement's arbitration provision fails under *Genesco*. *Genesco* recognizes that it would be impossible for any defen-

dant to have subjective knowledge of a plaintiff's state of mind on each and every contractual provision in a valid contract.

Therefore plaintiff's agreement to arbitrate is enforceable under New York law without her signature. *Lester v. Basner*, 676 F.Supp. 481 (S.D.N.Y.1987), held that a valid arbitration agreement must be in writing but need not be signed by the parties to the agreement. The court only requires that there be "some proof that the parties have agreed to arbitration." *Id.* at 483.

The court in *Hewett v. Marine Midland Bank of Southeastern New York, N.A.*, 449 N.Y.S.2d 745, 86 A.D.2d 263 (1982), held there is a rebuttable presumption that a signature is authorized. An unauthorized signature is one made without actual, implied or apparent authority, and any unauthorized signature is wholly inoperative unless the principal certifies it or is precluded from denying it. *Id.* at 749, 86 A.D.2d 263. Duncan had apparent authority to sign all agreements. Duncan opened and funded plaintiff's account, made decisions and trades related to her account and authorized receipt of mail on behalf of plaintiff. In *Hewett*, even when suspicious circumstances surrounded the endorsement, the court still found that the third party acting in reliance on the agent's authority acted in good faith. In the case at bar, there were not even any "suspicious circumstances" surrounding Duncan's acts.

*Hewett* also held that a principal may be precluded from denying an agent's authority by estoppel or negligence. *Id.* at 751, 86 A.D.2d 263. The existence of apparent authority depends on a showing that the third party relied on a misleading act by the principal. *Id.* Defendants point to plaintiff's "continuing acts of trading, writing checks on her CMA, using her VISA card, and obtaining credit from Merrill Lynch" as proof that plaintiff intended to be bound by the Agreement. Defendants are allowed to rely on those acts to prove the existence of apparent authority.

### 3. *Conclusion*

Therefore the plaintiff is bound to the CMA Agreement including the provision to

arbitrate all disputes. Plaintiff is either a third party beneficiary to Duncan's Agreement with defendants (evidenced by her use of the checking account and VISA card available only through the CMA service) or Merrill Lynch relied in good faith on Duncan's apparent authority to act for plaintiff.

### B. What Claims are Arbitrable
#### 1. *Federal Law Controls*

■ Federal law governs the arbitrability of contracts. 9 U.S.C. §§ 1–14; *Leicht v. Bateman Eichler, Hill Richards, Inc.*, 848 F.2d 130, 132 (9th Cir.1988); *Bayma v. Smith Barney, Harris, Upham*, 784 F.2d 1023, 1025 (9th Cir.1986). Consequently, federal law governs the issue of whether defendants may compel arbitration in this case.

#### 2. *Discussion*

■ Plaintiff relies on *Van Ness Townhouses v. Mar Industries Corp.*, 862 F.2d 754 (9th Cir.1989). I agree that *Van Ness* is controlling authority in this case. In *Van Ness* the plaintiffs' customer account agreement contained a provision generally requiring arbitration. However, the brokerage defendant inserted an exclusion to comply with former Securities Exchange Commission (SEC) Rule 15c2–2. That rule became effective December 28, 1983, and was rescinded October 15, 1987. Plaintiff's account Agreements were signed June 27, 1983.

Even though the Rule was not yet in effect when the Agreement was signed by Duncan (June 1983), the Rule required that accounts opened prior to December 28, 1983 be notified of rights to litigate according to such Rule by December 31, 1984. Defendants made the disclosures to plaintiff as required by SEC Rule 15c2–2 prior to December 31, 1984. Therefore since defendants delivered such disclosure to the plaintiff they are bound by it.

As here, the plaintiffs in *Van Ness* brought claims based on both the 1933 Securities Act and the 1934 Securities Exchange Act. The court observed that the exclusionary language in the agreement "indicates that when the agreement was signed, the parties understood and intended that certain claims were not arbitrable." The *Van Ness* defendants make many of the same arguments that the defendants at bar make, all of which were rejected by the Ninth Circuit. The defendants here argue there was no definitive ruling on the arbitrability of claims under the 1934 Act until 1987 in *Shearson/American Express v. McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987). Therefore, Rule 15c2–2 (enacted in 1983) could not have been intended to preclude arbitration of 1934 Act claims. The Ninth Circuit disagreed. It cited Exchange Act Release No. 25034, which rescinded SEC Rule 15c2–2, and which noted that existing case law generally held predispute arbitration agreements as to both the 1933 Act and the 1934 Act claims were void and unenforceable. *Van Ness* at 757. Based on this language the court concluded that "[i]t cannot be doubted that Rule 15c2–2 was intended to prohibit predispute agreements to arbitrate securities claims under both the 1933 and 1934 Acts." *Id.* at 757.

Defendants also argue that since public policy favors arbitration, any doubts must be resolved in favor of arbitration. While the *Van Ness* court did not disagree with the general proposition, it noted that "an agreement must exist before it may be enforced." *Id.* Because the court found no agreement to arbitrate the securities claims, public policy favoring arbitration could not support an order compelling arbitration. *Id.* at 597–598.

Finally, defendants argue that the exclusionary language was merely a notice provision to alert customers that certain claims may not be arbitrable, and that arbitrability of a particular dispute is to be determined by the substantive law at the time of the hearing. *Van Ness* found that argument unpersuasive, noting that it had rejected a similar argument in *Leicht*. The court found that the language in the customer account agreements "expressly excluded from arbitration those claims arising under the federal securities laws (both the 1933 and 1934 Acts). *A fortiori*, such an express exclusion from arbitration is an express grant of the right to litigate those claims." *Id.* at 758.

### 3. *Conclusion*

Therefore defendants' motion to stay proceedings pending arbitration is denied. *Van Ness* makes it clear that any provision purporting to bind a customer to arbitration of federal securities claims that were executed while Rule 15c2–2 was in force is simply unenforceable. *See also, Gugliotta v. Evans & Co., Inc.*, 690 F.Supp. 144 (E.D. N.Y.1988).

### III. DEFENDANTS' MOTION FOR A PROTECTIVE ORDER

Defendants' motion for a protective order is granted as follows: defendants do not have to comply with plaintiff's Request for Production of Documents (dated 9–3–88) or plaintiff's Request for Admissions (dated 10–5–88) until fourteen (14) days after the date of this Opinion and Order. Further, plaintiff may not schedule a deposition of defendants until fourteen (14) days after this date.