Nahum **MANELA**, Plaintiff,

v.

**GARANTIA BANKING LIMITED, and Garantia, Inc., Defendants.**

**No. 96 Civ. 0139 (LAK).**

United States District Court, S.D. New York.

Sept. 18, 1996.

David W. Rivkin, Eric J. Grannis, Debevoise & Plimpton, New York City, for Plaintiff.

Danforth Newcomb, Mary K. Warren, Shearman & Sterling, New York City, for Defendant.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Plaintiff, Nahum Manela, a wealthy Brazilian businessman, has brought suit in this Court against defendants Garantia, Inc. ("GI") and Garantia Banking, Ltd. ("GBL")—a Delaware corporation having its principal place of business in New York City and a Bahamian company having its principal place of business in Sao Paolo, Brazil, respectively—asserting claims for over $20 million in damages he allegedly sustained as a result of securities fraud, breach of contract, and other allegedly actionable conduct by defendants. The case is now before the Court on defendants' motion to dismiss on the ground of *forum non conveniens*.[1]

### Facts

#### Parties

Plaintiff, Nahum Manela, is chairman of the board of DeMillus, a large Brazilian manufacturer of women's undergarments. Defendants, GI and GBL, both are affiliates of Banco de Investimentos Garantia, S.A. ("BIG"), Brazil's largest investment bank. GBL, which has no employees or office of its own, is a wholly-owned subsidiary of BIG and pays BIG an annual fee for the services of some 25 BIG employees in Sao Paulo who conduct an investment banking business with GBL's clients, who predominantly are Brazilian. (Figueiredo Aff. ¶ 2) GI is an indirect wholly-owned subsidiary of BIG and a registered broker-dealer under the Securities Exchange Act of 1934. As noted, it is a Delaware corporation with its principal place of business in New York City.

#### The Events at Issue

In August 1994, plaintiff met Marcello Stallone at a party at plaintiff's home in Rio de Janeiro. Stallone identified himself to plaintiff as a trader for "Garantia" and suggested that plaintiff consider opening a margin account with Garantia for the purpose of trading in Brady bonds.[2] Stallone was em-

---

1. Defendants assert also that plaintiff's niece and daughter, Eva Goldman and Rosane Manela, are indispensable parties. As they have consented to be joined as plaintiffs, the motion to dismiss on the ground of failure to join them is denied as moot on condition that they actually appear as plaintiffs. (Goldman Aff. ¶ 3; E. Manela Aff. ¶ 3)

2. Brady bonds are bonds issued by developing countries under a plan formulated by then-Secretary of the Treasury Nicholas Brady. The bonds at issue in this case do not trade on American securities exchanges. Transactions in the bonds in which plaintiff invested are cleared through an entity called Euroclear and other European clearing corporations. (Figueiredo Aff. ¶ 13)

ployed by GI and worked at GI's New York headquarters.

Not long after his conversation with Stallone, plaintiff opened an account with GBL by transferring to GBL a pre-existing investment that he held in Brady bonds with a face value of $16 million and signing a Deposit Account Application.[3] Plaintiff's daughter, Rosane Manela, and his niece, Eva Goldman, signed the Account Application as "Joint Account Holders." During the fall of 1994, plaintiff deposited over $58 million in cash into his GBL account for the purchase of Brady bonds. In addition, plaintiff borrowed against the bonds themselves and other collateral on deposit with GBL to purchase more Brady bonds. By January 3, 1995, plaintiff held Brady bonds with a face value of approximately $330 million and a market value of approximately $175 million.

The funds that plaintiff borrowed from GBL to effect these transactions apparently were to be borrowed pursuant to a loan agreement between plaintiff and GBL.[4] GBL lent plaintiff money on a number of occasions, sending plaintiff loan documentation for his signature on each occasion, which plaintiff apparently never signed. (Figueiredo Aff. ¶ 11) The first loan agreement prepared by GBL provided that if the ratio of the value of the loan to the market value of the collateral exceeded 80 percent, plaintiff would post additional collateral or prepay part of the loan until the ratio was reduced to 70 percent. (Cpt ¶ 15) The term of the loan was for one month, although plaintiff contends that the parties intended that the loan would be renewed monthly, allowing plaintiff to hold the bonds until their maturity in 2014. (Cpt ¶ 18) Such monthly renewals apparently took place through January 1995. Moreover, plaintiff contends that the loan agreement was altered in December 1994 to provide that plaintiff would be required to post additional collateral or prepay part of the loan only if the value of the loan exceeded 85 percent of the market value of the collateral. (Cpt ¶ 21)

Although plaintiff never signed a loan agreement, he appears to be relying on its terms in the present action. Some of the more salient terms for purposes of defendants' motion bear mention. The agreement, written in English, provided that (i) it would be governed by the laws of the State of New York (N. Manela Aff., Ex. A § 12), (ii) the borrower consented to suit in the courts of the State of New York and in the Southern District of New York (*id.*, § 13), and (iii) the loan was payable to GBL's account at Norwest Bank International in New York City (*id.*, § 5).

The fact that plaintiff apparently never signed a loan agreement with GBL is only one of the unusual facets of his relationship with his bankers. Plaintiff claims that, although his deposit account and the loan were held by GBL, he was instructed to contact Stallone at GI in New York whenever he wished to make a transaction or wanted information regarding his account. (Manela Aff. ¶¶ 10–12) Plaintiff contends that he never instructed anyone other than Stallone to make transactions for his account. Defendants, on the other hand, contend that Manela's principal contact was Luiz Savio Viegas Barros, a BIG employee who served as plaintiff's "relationship manager" with GBL.[5] (Figueiredo Aff. ¶¶ 3 & 9) Defendants contend further that plaintiff routinely telephoned BIG traders directly to authorize transactions on his account without contacting Barros or Stallone. (*Id.*, ¶ 7). It is clear, at the very least, that although plaintiff did not initial the Deposit Account Application where indicated to authorize GBL to accept

---

**3.** The Deposit Account Application form was printed in English. *See* Figueiredo Aff. Ex. A.

**4.** Plaintiff has provided what appears to be the first such loan agreement, effective August 26, 1994, signed by a representative of GBL. (N. Manela Aff., Ex. A) The signature appears to belong to Eric Hime, who is identified elsewhere in defendants' papers as the supervisor of BIG's asset trading desk. (Figueiredo Aff. ¶ 19) The

agreement is not signed by plaintiff or either of the other account holders.

**5.** Plaintiff contends that it was Barros himself who instructed plaintiff to contact Stallone whenever he wished to direct that the bank make a transaction for his account. (N. Manela Aff. ¶ 10)

"verbal" instructions,[6] transactions routinely were carried out at plaintiff's behest on the basis of his oral instructions. (*E.g.*, N. Manela Aff. ¶ 12; Figueiredo Aff. ¶ 7)

The crux of this dispute involves transactions made on January 11 and 12, 1995. At about 8:00 a.m. on January 11, 1995, plaintiff says that his vacation in Florida was interrupted by a telephone call from Stallone. Stallone informed plaintiff that the market value of his Brady bonds had declined to the point that the collateral for his loan no longer was sufficient and that plaintiff would have to make a deposit as a prepayment of a portion of the loan or Stallone would sell a portion of plaintiff's bonds to make such a prepayment. Plaintiff claims that he told Stallone that he did not believe the value of his bonds had declined enough to require a margin call and that he did not authorize Stallone to sell the bonds to meet the margin call. (Cpt ¶ 22; N. Manela Aff. ¶ 21)

Stallone called plaintiff back an hour later to inform plaintiff that he had sold bonds from plaintiff's account with a face value of $45 million at an average price of 35.5 cents for approximately $16 million.[7] (Cpt ¶ 23; N. Manela Aff. ¶ 21) Plaintiff says that Stallone called plaintiff again, at 9:00 a.m. the next morning, and informed him that the bonds' price had increased to 40.5 cents. (Cpt ¶ 24; N. Manela Aff. ¶ 22) As a result, the collateral plaintiff had posted had risen in value enough that GBL was willing to allow plaintiff to restore his position. (*Id.*) Plaintiff says that he instructed Stallone to purchase bonds with a face amount of $40 million. (*Id.*) Stallone made the purchase, but at a price of 43.25 cents. (Cpt ¶ 24) Plaintiff now alleges that the buyer of his bonds on January 11 at a price of 35.5 cents in fact was GBL itself and that the next day Stallone sold him back the same bonds that GBL had purchased, but at a price of 43.25 cents. (Cpt ¶ 25) Plaintiff further alleges that (i) the price of the bonds had never declined to the point that a margin call was warranted

under the terms of his loan agreement with GBL (cpt ¶ 23), (ii) Stallone knew that the price of the bonds was rising when he sold plaintiff's bonds on January 11 (*id.*, at ¶ 27; N. Manela Aff. ¶ 21), and (iii) the opening bid and offer on the bonds on January 12 were 41.5 and 41.75 cents, respectively, and therefore below the 43.25 cents price at which Stallone purchased bonds for plaintiff's account (cpt ¶ 24). In short, plaintiff alleges that GBL profited at his expense from short-term volatility in the price of the bonds.

Plaintiff's suspicion that the margin call had not been warranted deepened, he says, when it took a week for him to receive written confirmation of the January 11 sale of his bonds. Up until that time, plaintiff says, written confirmation of his transactions always had been issued on the day after the transaction took place. (Cpt ¶ 26) After receiving the confirmation on January 18, plaintiff expressed his growing suspicion in a fax to Barros and another individual working for GBL at BIG's Sao Paolo office. In the fax, dated January 19, 1995, plaintiff requested proof that the value of the loan had exceeded 85 percent of the value of the collateral he had posted due to a decline in the price of the bonds. Plaintiff says that instead of receiving a response from GBL employees in Sao Paolo, he received a fax from Stallone in New York. (Cpt ¶ 27; N. Manela Aff. ¶ 23 & Ex. F)

Unsatisfied, plaintiff faxed a letter to GBL's president, Claudio Haddad, demanding that the January 11 sale of his bonds be rescinded. (Cpt ¶ 28) Plaintiff says that Haddad responded by fax on February 2, 1995. Haddad apparently contended that the January 11 sale of plaintiff's bonds was effected with plaintiff's consent. (Cpt ¶ 29; *see also* Figueiredo Aff. ¶ 16) Moreover, plaintiff contends that Haddad told plaintiff that if he did not, by the next day, repay the full outstanding amount of the loan, approximately $100 million, or designate another bank that would be willing to assume the loan,

---

6. The Court assumes that the deposit application form intended to ask whether the depositor authorized the bank to accept "oral" instructions. It is difficult, indeed, to imagine how a depositor might give non-verbal instructions to a bank.

7. Plaintiff claims that documents later provided to him show that Stallone actually sold bonds with a face amount of $51 million for approximately $18 million. (Cpt ¶ 23)

GBL would liquidate plaintiff's position. (Cpt ¶ 29) In fact, plaintiff says that he later learned that GBL had effected a partial prepayment of plaintiff's loan the day before Haddad's fax without informing plaintiff. (*Id.*)

On February 8, 1995, a meeting was held at BIG's Sao Paolo headquarters concerning plaintiff's complaints. Plaintiff attended with his Brazilian counsel, Sergio Eskanazi Pernidji. GBL was represented by Haddad. Reynaldo Figueiredo, head of BIG's private banking group, and Mario Cesare de Andrade, who is described by plaintiff as a partner in BIG and by Figueiredo as an attorney employed by BIG, attended for BIG. Interestingly, Stallone from GI's New York office attended the meeting, while Barros, plaintiff's Sao Paolo-based "relationship manager," did not.[8] (N. Manela Aff. ¶ 24; Figueiredo Aff. ¶ 17) Plaintiff contends that Haddad took a hard line at the meeting, insisting that GBL would not rescind the January 11 sale and that, unless plaintiff released all claims he might have against GBL arising out of the January 11 sale, GBL would cancel the loan and sell the collateral. (Cpt ¶ 30) Plaintiff says that he refused to release any such claims. (*Id.*)

Figueiredo says that, during February 1995, GBL sent plaintiff documents setting forth proposed new loan terms. The proposed new loan agreement apparently indicated that it was to be governed by Bahamian law and enforceable in the courts of the Commonwealth of the Bahamas. Plaintiff apparently never executed these documents. (Figueiredo Aff. ¶ 18)

Finally, plaintiff claims that on March 8, 1995, he received a fax from GBL warning that GBL would sell his bonds and pay off the loan by March 15, 1995, unless plaintiff paid the loan before that date. Plaintiff contends that, despite setting a March 15, 1995 deadline, GBL sold $65 million in face amount of his bonds between March 8 and March 10, without plaintiff's consent. Plain-

tiff ultimately transferred his remaining $225 million in face amount of bonds to Morgan Stanley, which then liquidated $71 million in face amount of the bonds because it was unwilling to finance plaintiff's position to the extent that GBL had. (Cpt ¶¶ 31–33)

At some point after the February 8, 1995 meeting, a wrinkle that is significant for purposes of the present motion was added to the facts of this case. Stallone left the employ of GI and is believed to be working in Rio de Janeiro for a financial concern unrelated to the parties to this litigation. (Ehrensperger Aff. ¶ 4) Less significantly, de Andrade left BIG, apparently to start his own law firm in Sao Paolo. (Figueiredo Aff. ¶ 17)

### *Discussion*

■ Defendants' *forum non conveniens* motion rests in significant part on the fact that non-party witnesses located in Brazil are beyond the subpoena power of this Court. They argue also that witnesses and documentary evidence in the case would need to be transported to New York and would require translation from Portuguese. They point to the fact that plaintiff is Brazilian and suggest that his attempt to compel witnesses employed by BIG to come to New York is intended to inconvenience defendants and, perhaps, to use the securities laws of the United States as a means of coercing defendants to settle this case. Ultimately, defendants contend that this is a dispute between a Brazilian plaintiff and his Brazilian bankers in which the United States has little interest, which properly ought to be tried in Brazil, and which may entail application of Brazilian law.

Plaintiff retorts that defendants have failed to demonstrate that the non-party witnesses are unwilling to testify, that the quantity of documents involved in the case is slight, that much of the documentation is in English, that virtually all of the significant witnesses speak English, and that GBL was content to pro-

---

**8.** Plaintiff claims that the meeting was attended also by an unnamed individual whom plaintiff identifies only as "the head of [BIG]'s legal department." (N. Manela Aff. ¶ 24) Figueiredo makes no reference to such a person attending the February 8 meeting. Figueiredo, without specifying dates, says that there were "meetings" with plaintiff and his counsel in February and March 1995. (Figueiredo Aff. ¶ 17) Plaintiff does not refer to any meetings other than the February 8, 1995 meeting.

pose New York as the forum for suit against plaintiff in the parties' loan agreement. Plaintiff denies that Brazil has a greater interest in the dispute than the United States, noting that defendant GI is a Delaware corporation and defendant GBL a Bahamian company. Moreover, plaintiff notes that GI is a broker-dealer registered with the U.S. Securities and Exchange Commission and argues that the United States has a strong interest in checking fraudulent conduct by entities located in the United States that engage in trading securities.

The principles articulated in *Gulf Oil Co. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), govern defendants' *forum non conveniens* motion. The Court's analysis proceeds in two steps. First it must determine whether an adequate alternative forum exists in which the case may be heard. *E.g., Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n. 22, 102 S.Ct. 252, 255 n. 22, 70 L.Ed.2d 419 (1981); *see Gilbert*, 330 U.S. at 506–07, 67 S.Ct. at 842–43. "Assuming there is such a forum, the Court then must balance a series of private and public interests in determining whether to retain the case or dismiss it in favor of [the] alternative forum." *Ioannides v. Marika Maritime Corp.*, 928 F.Supp. 374, 377 (S.D.N.Y.1996).

*Availability of Alternative Forum*

■ Defendants have submitted a declaration of Francisco Pinheiro Guimaraes, a Brazilian lawyer and partner in a Rio de Janeiro law firm, in order to demonstrate that the Brazilian courts are an available and suitable alternative forum. Certain basic elements of availability are not contested. Brazilian courts apparently recognize the existence of causes of action seeking remedies for the type of injuries plaintiff claims to have suffered and apply the laws of foreign jurisdictions if they determine that such laws properly are applicable. (Guimaraes Decl. ¶¶ 11–12) Moreover, defendants have indicated that they would consent to jurisdiction in Brazil as a condition of dismissal. (Def.Mem. at 11) Finally, the Court may condition dis-

missal on defendants' agreement to waive any statute of limitations defense that may have arisen under Brazilian law since the date that this action was filed, and may retain jurisdiction in the event that the Brazilian courts refuse to accept jurisdiction over the case. *See, e.g., Calavo Growers of California v. Generali Belgium*, 632 F.2d 963, 968 & n. 6 (2d Cir.1980) (district court should condition dismissal on waiver of limitations defenses and on foreign court's acceptance of jurisdiction), *cert. denied*, 449 U.S. 1084, 101 S.Ct. 871, 66 L.Ed.2d 809 (1981). *Accord El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 679 (D.C.Cir.1996).[9]

Plaintiff's principal complaint about Brazil as a forum for resolution of this dispute is not directed so much at the availability of the forum as at its adequacy. There is no pre-trial discovery of documents in Brazil comparable to that permitted in our federal courts. The declarations from Brazilian counsel submitted by each side confirm that, in litigation in a Brazilian court, a party may petition the court to appoint an expert who will inspect documents in the possession of an opposing party. The court then apparently may take testimony from the expert. (Guimaraes Decl. ¶ 7; Pernidji Decl. at 2–3) Plaintiff contends that this procedure seldom has been used and that the court-appointed expert has access only to those documents which the party is willing to make available. (Pernidji Decl. at 3)

Plaintiff argues that such limited document discovery renders Brazil an inadequate forum for resolution of this dispute. He anticipates that defendants will attempt to pin any blame on Stallone, arguing that Stallone acted alone and without his supervisors' knowledge. In order to rebut such an argument, plaintiff contends that he must be able to inspect documents that are likely to be in the possession of GI or GBL. Plaintiff wants access also to documents that would confirm or refute his theory that GBL was the counter-party in the January 11 sale and January 12 purchase of bonds on his account.

**9.** This disposes of plaintiff's objection that the Brazilian courts might be unavailable because they might decline to exercise any jurisdiction they may have over the case. It does not, however, address whether the public interest of the United States or of Brazil would be served by dismissing the case on the condition that it be heard in Brazil.

The unavailability of U.S.-style document discovery in Brazil is far from dispositive on the issue of the adequacy of a Brazilian forum. *Cf. Panama Processes, S.A. v. Cities Service Co.,* 650 F.2d 408 (2d Cir.1981) (affirming dismissal in favor of Brazilian forum). "[S]ome inconvenience or the unavailability of beneficial litigation procedures similar to those available in federal district courts does not render an alternative forum inadequate." *Scottish Air Int'l, Inc. v. British Caledonian Group, PLC,* 81 F.3d 1224, 1234 (2d Cir.1996) (quoting *Borden, Inc. v. Meiji Milk Products Co., Ltd.,* 919 F.2d 822, 829 (2d Cir.1990), *cert. denied,* 500 U.S. 953, 111 S.Ct. 2259, 114 L.Ed.2d 712 (1991)). While the Court is not prepared to say that unavailability of document discovery would never render an alternative forum inadequate, *cf. Borden,* 919 F.2d at 829 (making dismissal conditional on availability of procedure for expedited relief in alternative forum), the circumstances in which that might be so would be rare indeed, and this is not such a case. Here, the key witnesses all would be available to testify in the alternative forum, plaintiff seeks documents that may or may not exist,[10] principally in anticipation of a defense that may or may not be raised, and a mechanism, however imperfect, exists under Brazilian law to allow for the inspection of documents in the possession of a party. In these circumstances, this Court is not prepared to say that the alternative forum is inadequate.[11]

*Private Interest Factors*

■ As laid out in *Gilbert,* the next step in the *forum non conveniens* analysis is balancing the so-called "private interest factors" in order to determine the relative convenience of the forum and the proposed alternative.

"Important considerations are the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of the premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions as to the enforceability of a judgment if one is obtained. The court will weigh relative advantages and obstacles to fair trial. It is often said that the plaintiff may not, by choice of an inconvenient forum, 'vex', harass', or 'oppress' the defendant by inflicting upon him expense or trouble not necessary to his own right to pursue his remedy. But unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gilbert,* 330 U.S. at 508, 67 S.Ct. at 843.

As *Gilbert* makes clear, the burden at this stage of the analysis is on the movant to show that the balance of convenience tips "strongly" in favor of dismissal. *R. Maganlal & Co. v. M.G. Chemical Co., Inc.,* 942 F.2d 164, 167 (2d Cir.1991).

*Convenience of the Parties*

■ The Court will begin with the parties' contentions regarding the convenience to them of a New York forum. Defendants contend that New York is inconvenient both to them and to plaintiff, and that plaintiff has brought suit here not because New York is convenient to him but in order to vex or harass defendants. In this connection they note that a foreign plaintiff's choice of forum is entitled to less deference than that of a

---

10.  GI claims that it has no "routine documentation regarding [plaintiff's] account" and that its records "show that Stallone did not execute trades for the account." (Ehrensperger Aff. ¶ 3)

11.  There are two final points to be made with regard to the adequacy of the Brazilian forum. First, although the limited availability of document discovery in the Brazilian forum does not render that forum inadequate, it may be taken into account when evaluating the convenience of the alternative fora to the parties. *See Murray v. British Broadcasting Corp.,* 81 F.3d 287, 295 (2d Cir.1996).

The Court notes also that it rejects plaintiff's contention that Brazil is an inadequate alternative forum because it might take three years or longer for plaintiff's case to be tried there, and one year or longer for an appeal to be processed. "Delay is an unfortunate but ubiquitous aspect of the legal process. Our own courts suffer from delay, as does any other system that attempts to accord some modicum of process." *Bhatnagar v. Surrendra Overseas Ltd.,* 52 F.3d 1220, 1227 (3d Cir.1995) (holding that approximately 25 year delay is so excessive as to render alternative forum inadequate but that delay of two or two and one half years is not).

local plaintiff, precisely because there is less basis in such cases for the normal presumption that the plaintiff has chosen a forum that is convenient to him. *See Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 255, 102 S.Ct. 252, 265–66, 70 L.Ed.2d 419 (1981). Plaintiff retorts that defendants' contention that New York is inconvenient to them is contradicted by the loan agreement drafted by GBL, in which GBL sought to have plaintiff consent that suit on the agreement could be brought against him in New York.

Neither side's argument on this point is especially persuasive. Plaintiff's view of the consent to suit clause is contrary to precedent in this Circuit. Even assuming, without deciding, that the contract that plaintiff never signed is binding, the consent to suit clause is a permissive provision that does not bind defendants. Such a clause does not require defendants to make a heightened showing to prevail on a *forum non conveniens* motion. *Blanco v. Banco Industrial de Venezuela, S.A.,* 997 F.2d 974, 979–80 (2d Cir.1993).

■ Defendant GI, however, is in the "unusual" position of asserting that the forum in which it is headquartered is inconvenient to it. *Schertenleib v. Traum,* 589 F.2d 1156, 1164 (2d Cir.1978). The fact that a defendant resides in the forum "weighs heavily against dismissal." *Id., quoted in Manu Int'l, S.A. v. Avon Products, Inc.,* 641 F.2d 62, 67 (2d Cir.1981). The fact that plaintiff is not himself a resident of the United States, while reducing the weight given to his choice of forum, "is not an invitation to accord [his] selection of an American forum no deference since dismissal for *forum non conveniens* is the exception rather than the rule." *In re Air Crash Disaster Near New Orleans, La. on July 9, 1982,* 821 F.2d 1147, 1164 n. 26 (5th Cir.1987), *vacated on other grounds,* 490 U.S. 1032, 109 S.Ct. 1928, 104 L.Ed.2d 400 (1989); *accord Bhatnagar v. Surrendra Overseas Ltd.,* 52 F.3d 1220, 1226 n. 4 (3d Cir.1995). In this case, plaintiff undoubtedly is aware that trying his case in New York will entail greater expense to him in transporting witnesses and the like,[12] but he apparently has concluded that this inconvenience is outweighed by the types of difficulties that he has indicated he would face in a Brazilian forum such as limited document discovery and potentially greater delay. In such a case, a foreign plaintiff's choice between two inconvenient fora is entitled to some deference even where, as here, the forum is manifestly inconvenient for a defendant, as is true for GBL. *See Lacey v. Cessna Aircraft Co.,* 862 F.2d 38, 46 (3d Cir.1988).

### Availability of Witnesses

■ Defendants base their motion in large part on the assertion that key witnesses will not be available to testify in person if the case is tried in New York. In particular, defendants note that if, in fact, Stallone is now in Brazil, he is beyond the subpoena power of this Court and therefore may not be compelled to testify in person if the case is heard here. As the language quoted above from *Gilbert* makes clear, however, there is a distinction between "unwilling" witnesses, as to whom the question is whether they can be compelled to appear, and "willing" witnesses, as to whom the question is the cost associated with having them appear. Defendants bear the burden on their motion to dismiss,[13] and they have failed to produce evidence, or even to allege, that Stallone would be unwilling to testify in New York.[14] Even if he were unwilling to appear, defendants have offered no suggestion as to what his testimony might be and whether their inability to

---

12. In any case, the defendants cannot rely on any inconvenience to plaintiff and witnesses whose expenses plaintiff will bear. *Close v. Holiday Inns of America, Inc.,* No. CIV–86–189E, 1987 WL 8951, at *2 (W.D.N.Y. Apr. 3, 1987); *Holiday Rambler Corp. v. American Motors Corp.,* 254 F.Supp. 137 (W.D.Mich.1966).

13. *Lacey v. Cessna Aircraft Co.,* 862 F.2d 38, 43–44 (2d Cir.1988); *G.B.C. Nigeria, Ltd. v. M.V. Sophia First,* 588 F.Supp. 76, 78 (S.D.N.Y.1984).

14. Some courts have presumed, in the absence of evidence to the contrary, that former employees are willing to testify on behalf of their former employers. *E.g., Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.,* 821 F.Supp. 962, 967 (D.Del.1993).

obtain it would be prejudicial to them.[15] Moreover, while it is less than the ideal method for taking testimony, Stallone's testimony probably can be secured pursuant to letters rogatory, perhaps even in the manner customary in our courts.[16] *See, e.g.,* Fed. R.Civ.P. 28(b) & 29; *R. Maganlal & Co. v. M.G. Chemical Co., Inc.,* 942 F.2d 164, 168 (2d Cir.1991); *American Special Risk Ins. Co. v. Delta America Re Insurance Co.,* 634 F.Supp. 112, 117 (S.D.N.Y.1986); *G.B.C. Nigeria, Ltd. v. M.V. Sophia First,* 588 F.Supp. 76, 80 (S.D.N.Y.1984).

Defendants argue that other witnesses—de Andrade and a former BIG employee who calculated margin on plaintiff's account—also may be unavailable if the case is tried in New York. Defendants' contentions with regard to these witnesses have the same defects as their contentions with regard to Stallone's alleged unavailability. Moreover, the need for these witnesses' testimony is doubtful. de Andrade was a witness to the February 8 meeting, but so also were Haddad, Figueiredo, plaintiff, and plaintiff's Brazilian counsel. Thus, it seems quite likely that de Andrade's evidence would be cumulative. As for the former BIG employee who allegedly calculated margin on plaintiff's account, there is no evidence that his testimony would be necessary or that it would not be rendered superfluous by records of what, in fact, his calculations were.

Thus, the Court holds that defendants have failed to meet their burden of demonstrating that the potential unavailability of allegedly unwilling witnesses if the case goes forward in New York favors dismissal.

*Considerations Relating to Willing Witnesses*

On the other hand, it is clear that all of the witnesses whose whereabouts are known are located in Brazil. Thus, the convenience of the witnesses and the cost of obtaining testimony from willing witnesses certainly favors trial in Brazil. The weight to be given to this factor however, is not necessarily great.[17] The number of witnesses involved is small. Most are employed by parties or are members of plaintiff's family. The amount in controversy far outweighs any increase in costs that would accrue from trying the case in New York. In such circumstances, while the location of the wit-

---

**15.** *Cf. Factors Etc., Inc. v. Pro Arts, Inc.,* 579 F.2d 215, 218 (2d Cir.1978) (party moving to transfer on ground of convenience of witnesses must identify substance of their testimony), *cert. denied,* 440 U.S. 908 (1979). *See also Haskel v. FPR Registry, Inc.,* 862 F.Supp. 909, 917 (E.D.N.Y.1994) (party seeking to set aside forum selection clause on ground that it would deprive her of witnesses must give summary of their testimony and show why deposition testimony would be inadequate); *O'Brien v. Goldstar Technology, Inc.,* 812 F.Supp. 383, 387 (W.D.N.Y. 1993) (party seeking to transfer case on ground that witnesses are unwilling or unable to testify must prove that such witnesses are in fact unwilling to testify and indicate what the substance of their testimony would be); *Mercier v. Sheraton Int'l, Inc.,* 744 F.Supp. 380, 385–86 (D.Mass. 1990) (movant should produce evidence that it has asked witness to testify and that witness has refused to do so), *vacated on other grounds,* 935 F.2d 419 (1990); *Mowrey v. Johnson & Johnson,* 524 F.Supp. 771, 776–77 (W.D.Pa.1981) (party asserting *forum non conveniens* on ground of lack of compulsory process must show how it is prejudiced by lack of witnesses' testimony).

**16.** The United States and Brazil both are parties to the Inter–American Convention on Letters Rogatory, Jan. 30, 1975, and the Additional Protocol to the Inter–American Convention on Letters Rogatory, May 8, 1979. S.Treaty Doc. No. 98–27, (entered into force Aug. 27, 1988, 53 Fed.Reg. 31,132 (1988)). (The text of the conventions and the names of current signatory nations appear following 28 U.S.C.A. § 1781 (West 1994).) Article 10 permits the execution of letters rogatory "through a special procedure" provided that it is not contrary to the law of the executing state. *Id.,* Art. 10. A U.S. court therefore could request that Brazilian witnesses be examined and cross-examined under oath. No one has suggested that such a procedure would be contrary to Brazilian law, although it presumably is not the usual Brazilian method of proceeding.

**17.** No single factor in the *forum non conveniens* analysis is dispositive, nor even entitled to "central emphasis." *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 249–50, 102 S.Ct. 252, 262–63, 70 L.Ed.2d 419 (1981). Accordingly, the geographical location of witnesses is not determinative, particularly in light of the ease of modern transportation and communication and the possibility of taking testimony where the witnesses are located. *Lehman v. Humphrey Cayman, Ltd.,* 713 F.2d 339, 343 (8th Cir.1983), *cert. denied,* 464 U.S. 1042, 104 S.Ct. 708, 79 L.Ed.2d 172 (1984). *See also Calavo Growers of California v. Generali Belgium,* 632 F.2d 963, 969 (2d Cir.1980) (Newman, J., concurring).

nesses weighs in favor of dismissal, it does not do so heavily.

■ Defendants contend, however, that even assuming the witnesses are available, the need to translate the testimony of native Portuguese speakers renders New York an inconvenient forum for this litigation. As plaintiff points out, however, this concern is exaggerated in light of the fact that most of the key witnesses in this case—among them plaintiff, Stallone, Figueiredo, and Haddad—speak English. (N. Manela Aff. ¶ 24) The only significant named witness who defendants claim would require translation is Barros, although they concede that he does speak some English. (Figueiredo Aff. ¶ 3) Defendants argue principally that translation would be necessary not so much for capturing the sense of what the witnesses have to say but, rather, in order to capture subtleties in the conversations between plaintiff and his bankers. It is far from clear, however, that this case turns on such nuances. *Cf. Opert v. Schmid*, 535 F.Supp. 591, 595 (S.D.N.Y.1982) (defamation action in which allegedly defamatory statements would have required translation dismissed on ground of *forum non conveniens* ). Nor is Portuguese so obscure a language as to render locating such translation services as may be needed difficult. *Cf. Dawson v. Compagnie Des Bauxites De Guinee*, 593 F.Supp. 20, 26 (D.Del.) (need to translate testimony from native Guinean languages supported *forum non conveniens* motion), *aff'd*, 746 F.2d 1466 (3d Cir.1984) (table); *Reavis v. Gulf Oil Corp.*, 85 F.R.D. 666 n. 5 (D.Del.1980) (Spanish not so "obscure" as to offer strong evidence that forum was inconvenient). Thus, while there may be some need for translation in this Court that would be obviated were the case tried in

Brazil, it is not clear that the testimony that would be translated would be critical or that its translation would be difficult.

### Access to Documentary Evidence

■ Defendants contend also that New York is an inconvenient forum because the documents that may be involved in this case are not located in the New York area and might have to be translated from Portuguese. As defendants themselves argue, however, in opposition to plaintiff's contention that Brazil's limited document discovery renders Brazil an inadequate forum, the quantity of documents involved is small. (Reply Mem. at 8) *See G.B.C. Nigeria Ltd. v. M.V. Sophia First*, 588 F.Supp. 76, 79 (S.D.N.Y.1984) (unless relevant documents are voluminous, their location does not favor suit where documents are found). Moreover, the bulk of the documents in the record thus far are in English, and defendants concede that GBL maintains its records in English, the language of its place of incorporation.[18] (Figueiredo Aff. ¶ 6) Among the documents that are in English are the deposit account agreement and the loan agreement, which are fundamental to the case. In addition, as discussed above, the opportunity for obtaining discovery of documents in Brazil is quite limited, reducing the likelihood that documentary evidence would be available in that forum. On balance, then, the Court finds that there will be greater ease of access to documents if the action is tried in New York.

In summary, Brazil would be the more convenient forum for the witnesses and would avoid any need to translate testimony. New York, on the other hand, would allow greater access to documents and is the forum in which GI resides.[19] In these circum-

---

18. *See Manu Int'l, S.A. v. Avon Products, Inc.*, 641 F.2d 62, 66 (2d Cir.1981) (translation not in issue where documents produced up until time of motion were in English); *Petcor v. Mega Breeze*, No. 91–CV–1387, 1992 WL 245587, at *4 (N.D.N.Y. Sept. 16, 1992) (existence of limited need for translation does not weigh heavily in favor of dismissal where majority of documents of record are in English); *Alliance Assurance Co., Ltd. v. Luria Bros. & Co., Inc.*, No. 86 Civ. 1151 (CBM), 1987 WL 10031, at *5 (S.D.N.Y. Apr. 22, 1987) (where agreement at issue was in English, possibility that some documents might require translation has limited weight).

19. Plaintiff contends that a judgment obtained in Brazil may be unenforceable there because, he contends, defendants GI and GBL lack assets there. Defendants deny this. In any case, this factor does not weigh against dismissal, as plaintiff could readily enforce a judgment obtained in Brazil here in New York. *See In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India, in Dec. 1984*, 809 F.2d 195, 204 (2d Cir.), *cert. denied*, 484 U.S. 871, 108 S.Ct. 199, 98 L.Ed.2d 150 (1987).

stances, defendants have not carried their burden of showing that the *Gilbert* private interest factors weigh strongly in favor of dismissal.

*Public Interest Factors*

The public interest factors likewise do not weigh strongly in favor of trial in Brazil and, indeed, may favor retention of jurisdiction by this Court. As laid out in *Gilbert*, the public interest factors are as follows:

> "[f]actors of public interests also have a place in applying the doctrine. Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation. In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home. There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself." 330 U.S. at 508–09, 67 S.Ct. at 843.

With respect to the public interest factors, the defendants argue principally that this is a Brazilian controversy, will entangle this Court in questions of conflict of laws, and will require application of Brazilian law.

*Resolution of Localized Controversies*

Defendants attempt to characterize this case as a dispute between a Brazilian investor and his Brazilian bankers involving bonds issued by the Brazilian government. The reality of today's increasingly global markets, as evidenced by this case, however, is more complex. GBL is a Bahamian company and GI a Delaware corporation headquartered in New York. While the bonds represent the external debt of Brazil and did not trade on United States securities markets, neither did they trade on Brazilian markets. Stallone, the trader who is alleged to have perpetrated a fraud on plaintiff—while plaintiff was in Florida, albeit fortuitously so—was employed at the New York headquarters of GI, a broker-dealer registered with the U.S. Securities and Exchange Commission. In these circumstances, a Brazilian court might well regard this dispute as having connections to the United States that are as substantial as any connections that it may have to Brazil. The United States, moreover, has a strong interest in policing fraudulent misrepresentations made within this country in connection with the purchase and sale of securities regardless of the nationality of the victim, the tortfeasor, or the issuer. *See IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1013 (2d Cir.1975); *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326, 1336 (2d Cir.1972); *CL–Alexanders Laing & Cruickshank v. Goldfeld*, 709 F.Supp. 472, 481 (S.D.N.Y.1989). Accordingly, this forum has at least as great an interest in this dispute as does Brazil.

*Application of Foreign Law*

Defendants contend also that hearing this case will entangle the Court in conflict of law issues and may entail the application of Brazilian law. There is little doubt that the potential choice of law issues in this case are significant. That appears likely the case, however, irrespective of whether the case is litigated here or in Brazil. There are at least two key questions that arise in this connection: (i) what law determines whether the loan agreement is binding, and if so (ii) whether its New York governing law clause is enforceable. The Court does not at this time decide what law governs, as the parties have failed to provide any evidence of what Brazilian law is in either regard and there may be no conflict and, thus, no need to choose. *See Loebig v. Larucci*, 572 F.2d 81, 85 (2d Cir.1978). At this stage, the Court simply notes that credible arguments can be made that New York law, assuming it differs from that of Brazil, would apply to this case.

Had plaintiff signed the loan agreement containing the New York governing law clause, there would be little doubt that New York law would apply. *See Zerman v. Ball*, 735 F.2d 15, 20 (2d Cir.1984). In the absence

of plaintiff's signature, the threshold question is whether defendants nevertheless are bound by the contract.

In deciding this issue, the Court, if confronted with a conflict of laws, would apply the choice of law rules of New York to determine the governing law. *Id.* Under New York's choice of law rules, there are two possible approaches. First, there is authority suggesting that questions of contract formation are to be decided by reference to the law chosen by the parties to the contract at issue, here New York law. *See International Minerals and Resources, S.A. v. Pappas,* 96 F.3d 586, 592–93 (2d Cir.1996) (holding that English law governed issue of contract formation where contract provided that it was governed by English law); *Wehe v. Montgomery,* 711 F.Supp. 1035, 1036 (D.Or. 1989) (applying New York law); RESTATEMENT, SECOND, CONFLICT OF LAWS § 187, *cmt. d* (1971). Alternatively, assuming *arguendo* that the Court did not apply the contractual governing law clause to the question whether the contract is enforceable, it would select the governing law by determining which jurisdiction has the paramount interest in the issue. *Hutner v. Greene,* 734 F.2d 896, 899 (2d Cir.1984). In this case, the loan was denominated in dollars, payable to GBL through its New York account, and at least some transactions for plaintiff's account were conducted through GI, a Delaware corporation, from its headquarters in New York. In such cases, in light of New York's role as an international financial capital, New York courts often apply New York law to disputes arising out of the parties' agreements, even in the absence of a choice of law clause. *See Wells Fargo Asia Ltd. v. Citibank, N.A.,* 936 F.2d 723, 726–27 (2d Cir.1991), *cert. denied,* 505 U.S. 1204, 112 S.Ct. 2990, 120 L.Ed.2d 868 (1992); *J. Zeevi and Sons, Ltd. v. Grindlays Bank (Uganda) Ltd.,* 37 N.Y.2d 220, 227, 371 N.Y.S.2d 892, 898–99, 333 N.E.2d 168, 172–73, (1975).[20] In either event, a conclusion that New York law governs the contract formation issue likely would result in the application of New York law to all or most state law issues in the case as, under New York law, a written contract normally is enforceable against a subscribing party. N.Y.GEN.OBLIG.LAW § 5–701 (McKinney 1989).

If, on the other hand, the Court were to conclude that neither the loan agreement's governing law clause nor the interests of New York in this dispute mandate application of New York law to the issue of contract formation, it would apply Brazilian law. Even a conclusion that Brazilian law would govern the contract formation issue, however, would not necessarily mean that Brazilian law would govern the entire case. For if the defendants are bound, under Brazilian law, by the loan agreement, then the governing law clause it contains chooses New York law to govern the relationship between the parties. Thus, it appears that there is a significant possibility that much of this dispute will be governed by New York law pursuant to the parties' agreement irrespective of what law governs the contract formation issue.

In order to rely on the applicability of foreign law in support of their motion, defendants had the burden of showing that foreign law likely would be applicable to this case. As the preceding discussion indicates, they have failed to do so. There is a significant possibility that New York law applies. Even if Brazilian law applies to the issue of contract formation, a conclusion that the loan agreement is enforceable may well lead to the application of New York law to the remaining issues in the case. Accordingly, defendants' foreign law argument is substantially overstated.

The public interest factors do not substantially favor dismissal, if indeed they favor it at all. The controversy is not sufficiently localized to Brazil as to give Brazil a significantly stronger interest in resolving it than the United States has, and resolution of the dispute may well require application of New York law to many, if not all, of the issues in this case.

**20.** In *Wells Fargo Asia Ltd.,* the Second Circuit affirmed the district court's application of New York law "where ... the transactions were denominated in United States dollars and settled through the parties' New York correspondent banks, and where the defendant is a United States bank with headquarters in New York." 936 F.2d at 726.

*Conclusion*

To summarize, the cost of obtaining testimony from and the convenience of the witnesses weighs in favor of dismissal. Plaintiff's choice of forum, GI's presence in New York, the greater possibility of obtaining documentary evidence here, and the U.S. interest in adjudicating claims that its soil was used for fraudulent securities transactions all weigh against dismissal. The other elements of the analysis either are neutral or immaterial to this dispute. Thus, the balance does not tip sufficiently in defendants' favor to warrant dismissal.

Accordingly, the motion to dismiss on ground of *forum non conveniens* is denied. The motion to dismiss for failure to join indispensable parties is denied as moot on the condition that plaintiff file an amended complaint within 21 days joining as plaintiffs Eva Goldman and Rosane Manela. The Court will hold a scheduling conference at 2:30 p.m. on September 30, 1996 in Courtroom 12D.

SO ORDERED.